922 F.Supp. 217 (1996)
Mark ELITT, et al., Plaintiffs,
v.
U.S.A. HOCKEY, et al., Defendants.
No. 4:95CV1710 ERW.
United States District Court, E.D. Missouri, Eastern Division.
March 19, 1996.
*218 Ramon J. Morganstern, Morganstern Law Office, St. Louis, MO, for Mark Elitt, a minor nfr Donald Elitt nfr Sharon Elitt, Donald Elitt, Sharon Elitt.
Alan G. Gerson, Blumenfeld and Kaplan, St. Louis, MO, James A. O'Neal, Faegre and Benson, Minneapolis, MN, for U.S.A. Hockey, Inc.
Alan G. Gerson, Blumenfeld and Kaplan, St. Louis, MO, for Baaron Pittenger, Peter Lindberg, W. David Tyler, Creve Coeur Hockey Club, Kevin Pallardy, Jim Klimt, Phil Lovecchio, Bert Schweizer, Mike Lieberman, Dave Kaiser, Fred Moroni, Mike Duffy, Stuart Bascomb, Richard Kleiner, George Shuert, Dick Trippeer.

MEMORANDUM AND ORDER
WEBBER, District Judge.
Plaintiffs bring this action under Subchapter III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182.[1] They request a temporary restraining order and a preliminary injunction to compel Mark Elitt's participation in the Creve Coeur Hockey Club in Creve Coeur, Missouri.
Mark Elitt is speech and language impaired and has at least average intelligence. For three years, he participated in the hockey program at the Creve Coeur Hockey Club with no apparent difficulty. Mark has been diagnosed with Attention Deficit Disorder (A.D.D.) and is taking the prescribed drug Prozac, an anti-depressant. Although the medication helps him focus and reduces obsessive-compulsive behavior, he becomes disoriented when participating in hockey activities. Plaintiffs request that special accommodation be made by defendants to allow either one of Mark's two brothers or Mark's father to be on the ice with Mark during practices and scrimmages. Plaintiffs argue that this accommodation would help keep Mark "focused." Furthermore, plaintiffs request that Mark be allowed to "play down" to a lower age group.
Mark communicates at a five to six-year old level according to testimony, but in chambers, his communication skills in the absence of coaching were practically non-existent. At an in-chamber conference, Mark experienced difficulty in answering very simple questions without assistance from his parents.
Defendant U.S.A. Hockey is an umbrella organization (recognized by the U.S. Olympic Committee) which sponsors U.S. amateur hockey affiliates such as defendant Creve Coeur Hockey Club. More than 4,000 individuals are currently enrolled as players, coaches, or officials in the U.S.A. Hockey Program throughout the United States. In each affiliate youth hockey league, players are divided into different age and skill levels to accomplish different purposes. Players are divided by age into the following categories:

Group Age Level
Mini-Mite & Mite 6-7 years (Enrollments up to July
 1)
Squirt 8-9 years (Enrollments up to July
 1)
Pee-Wee 10-11 years (Enrollments up to
 July 1)

Within each age group, players may choose to participate in a "house program," designed for recreational play and to develop skills. The house program does not require try-outs but does divide players into teams based on ability. Body checking is not permitted at the house level but does occur incidentally.
Although U.S.A. Hockey's mission statement describes the house program as noncompetitive, this Court finds that it has both non-competitive and competitive elements. The non-competitive side consists of practice sessions. Plaintiffs request that one of Mark's brothers or father be on the ice during these practices, and there is no testimony or evidentiary support to suggest that their presence has caused an inconvenience or poses *219 danger to any other player or to Mark. In fact, other persons besides the players frequently stay on the ice during practices, apparently without incident. As for the competitive side of the house program, players participate in scrimmages. Scores are kept and players often scrimmage against other hockey organizations outside of the Creve Coeur area.
In the St. Louis Metropolitan area, there is a program for persons with observable disabilities called the Gateway Hockey Association program. Mark's parents have elected not to enroll him in that program because they want him to have as much contact as possible with "normally-developing" young adults.
On January 25, 1996, an "evaluation" was conducted of Mark at the Creve Coeur Hockey Club. He appeared on the ice with and without the assistance of his brother. In the evaluation, it was observed that Mark was several inches taller than the other participants in the house program. When Mark's brother was on the ice with him, Mark appeared to be more focused, followed the plays more consistently, and handled his hockey stick skillfully and appropriately. When Mark's brother left the ice, Mark became less focused. Finally, at some point during the exercise, one of the coaches was skating backwards and a collision resulted between Mark and the coach. There is no showing that the collision was the fault of Mark.
Garrett Charles Burris, a pediatric neurologist, testified that Mark's A.D.D. makes it difficult for him to get focused. As complexity increases, Mark has problems keeping focused and needs to be redirected. The presence of Mark's brother on the ice helps Mark focus his activities. According to Dr. Burris, Mark has good intellectual function but because of a language disability cannot communicate beyond the five or six-year old level. Dr. Burris noted that Mark can respond to verbal instructions. Additionally, it is Dr. Burris' opinion that Mark's interaction with "ordinary kids" would be an effective aid in developing more advanced motor and social skills. Because Dr. Burris believes that Mark is not a danger to himself or to others on the ice, he states that Mark would gain from participation with "ordinary kids" and would not benefit from participation in the Gateway program.
Mark Hilton, D.D.S., has been involved with amateur youth hockey for about eight years. He observed Mark on the ice for the January 25, 1996 evaluation. He saw Mark receiving directions from his brother, and he recognizes that Mark's communication deficiencies could be a problem in communicating with other players. It is his belief that Mark is not a safety threat on the ice.
Mark has been involved in a swimming program at the YMCA, receiving instruction from Rene Haulard. Rene works with Mark two or three nights a week for a period of one hour each lesson. Mark's development as a swimmer has substantially increased, as he can now employ three strokes and participates on a swim team with "normal" members. Other parents have not complained about Mark's participation. Rene explains that he can communicate with Mark by using simple words. Also, Rene states that he can help keep Mark focused by getting into the water with Mark. During their association, Rene notes that he and Mark have become good friends and that other swim team members look out for Mark. Rene was present on January 25, 1996 evaluation. It is his view that Mark remained focused and followed the game more closely when his brother was on the ice. Rene states that Mark can play as well as any other player if a coach will take the time to work with him. He believes it would be beneficial for Mark to play down at a lower age level.
Chris Elitt, Mark's brother, is a very articulate young man, obviously dedicated to assist Mark to improve any of his sporting skills. He is knowledgeable about hockey because he played in house and league programs and currently plays hockey for John Burrows High School. He observed Mark participating in the house program for a few years at the Mini-Mite and Mite levels. Chris went on the ice with Mark every other time he participated for a total of between twenty and thirty times. He states that Mark possesses the physical ability to play the game of hockey and can communicate *220 with the coach if the coach uses simple language. Also, Chris does not recall Mark ever being involved in or was the cause of injury to himself or anyone else. He was present on January 25, 1996 for Mark's evaluation. While Chris admits that Mark needs help to remain focused, he believes that Mark demonstrated the ability to play the game.
At the evaluation when Mark skated by himself, he was able to follow the puck, however, no one passed to him and he did not pass the puck to anyone else. All who observed agree that without someone on the ice to help Mark, he does not participate like the other skaters. He cannot fully participate in the game without assistance.
Sharon Elitt, Mark's mother, observes that the English language is virtually a foreign language to Mark. His A.D.D. and language disability impacts upon him individually at every setting. Mrs. Elitt communicates with him by using language that he understands and by using constant repetition. For three years, Mrs. Elitt enrolled Mark in Creve Coeur's house program at the Mini-Mite and Mite age level. Thereafter, Mrs. Elitt petitioned Creve Coeur Hockey to let Mark play down to the Mite level instead of moving up to the Squirt level. Creve Coeur Hockey denied Mrs. Elitt's request, citing insurance coverage problems for Mark. In response, the Elitt's pursued the present litigation. She believes that Mark's participation, and it is undisputed, would advance his social, academic, and language level. Currently, Mark does not attend school in the public school system and receives education at home.
Mrs. Elitt believes that because Mark missed two years of hockey participation, he should be permitted to play down with younger children. She acknowledges that Mark has a communication deficit but states that Mark can communicate with gestures. She also realizes that a potential for injury exists but maintains that Mark skates well and will neither run into others nor permit others to run into him. As a result, Mrs. Elitt moves the Court to permit Mark to be assisted by his brother or by his father while he is on the ice. Furthermore, even though he is now a "Pee-Wee," she requests that he be permitted to participate in the house program at the "Squirt" level.
During the evidentiary hearing, it became clear that both parents placed incorrect dates on Creve Coeur Hockey application forms. Before the 1993-94 season, Mark's parents listed his birthdate correctly as April 15, 1984. However, on the 1993-94 application form, Donald Elitt, D.D.S. (Mark's father) requested that the application form be changed to list Mark's birthdate as April 15, 1985. Dr. Elitt confesses that he knew Mark's correct birthdate but felt that Mark's enrollment in a lower age group would benefit his son, a docile individual who would never impose a danger to himself or to others. Application forms for the 1994-95 and 1995-96 were falsified in the same manner. Sharon Elitt also admits to giving Creve Coeur Hockey Club false information and admits that Mark's true birthdate would have in fact placed him in the Pee Wee level for the current season.
Dr. Elitt is familiar with the Gateway Hockey Program which permits participation by persons through age level thirty. He expresses concern about Mark's participation with people who are much bigger and larger. It is very clear that Dr. and Mrs. Elitt are extremely dedicated parents, willing to make any sacrifices to benefit Mark, who, notwithstanding language deficit and A.D.D. impairment, continues to make progressive strides in his development.
John Robinson, Director of Insurance and Risk Management for U.S.A. Hockey, Inc., Colorado Springs, CO, testified about U.S.A. Hockey's insurance coverage. The U.S.A. Hockey Club makes determinations as to who is eligible for participation. There are three categories of insurance coverage for participants up to age 17: (1) Basic, (2) Catastrophic, and (3) General Liability. In Missouri, a facility such as Creve Coeur's requires insurance coverage. To determine insurance liability, U.S.A. Hockey ordered an evaluation of Mark's playing abilities. Evaluations had been requested on seven previous occasions but the Elitts did not agree to an evaluation until January 25, 1996. Following the evaluation, U.S.A. Hockey concluded that Mark's participation *221 in a younger age group would be unsafe and that insurance could not be provided. Diane Schaefering and Bill Ridecceo conducted the evaluation for U.S.A. Hockey, Inc. Ms. Schaefering is a self-employed power skating instructor with 18 years of experience. She has assisted and coached at the Mini-Mite, Mite, Squirt, and Pee-Wee league levels. Also, she has three boys who have played hockey at the Mite, Pee-Wee, and Squirt age levels. Ms. Schaefering sits on the Board of Directors for Chesterfield Hockey and has been associated with Creve Coeur Hockey Club as a coach. From her experience with youth hockey, she concludes that players at the Mini-Mite and Mite level lack well-developed skills, including eye-hand coordination. As players age up to the Squirt and Pee-Wee levels, they develop more skills, become faster, and obtain better eye-hand coordination. Ms. Schaefering also makes several observations about the house program. She believes house level participation has historically become more competitive, evidenced in part by interleague scrimmages (i.e. scrimmages with house programs outside of the Creve Coeur area). Consequently, it is becoming increasingly more difficult to differentiate between the house and league programs insofar as the degree of competition is concerned.
Ms. Schaefering observed Mark's evaluation on January 25, 1996. At first, with his brother on the ice, Mark participated with the group and demonstrated adequate skills. However, his brother constantly coached Mark on what position to assume, where to go, and what to do. Unless his brother directed him, Ms. Schaffeling observed that Mark did not understand what was going on. Following the drills session, players participated in a scrimmage. With Mark's brother on the ice during the early part of the scrimmage, Mark tended to follow the other children and appeared to have no idea where the flow of the game would take him. As the flow of the game continually changed, he was not aware of his position and did not have enough skill or awareness to stop. She concurred that there was a potential for him being harmed or harming someone else. The appearance of someone else on the ice, while helpful to Mark, would be a hindrance to others. She concluded that close association between players is important and that in the long run Mark's teammates would be resentful because of his need for special assistance. On the question of playing at a different age level, Ms. Schaefering has never heard of anyone playing down to a lower age level. She has only heard of players moving up to a higher age level when their exceptional skills permitted such a move. Ms. Schaefering believes that playing down would be less problematic in practice sessions than in game situations. As for Mark, she acknowledges that it would be beneficial for him to have contact with normal players but she believes that children with special needs should have those needs addressed by trained professionals. Ms. Schaefering believes that he would be given proper attention at the Gateway Program.
Philip Lovicchio testified by deposition. Mr. Lovicchio played hockey in college and has been a registered referee for twenty-two years. He has refereed a world tournament and some national tournaments and has coached in the Creve Coeur club program for six years. Mr. Lovicchio has been on the Executive Operating Committee of the Creve Coeur Hockey Club since 1991 and is vice-president in charge of the house league program. He describes the house league program as a collection of players who just want to play hockey for recreational purposes, or who do not want to play at a more competitive level, or who do not desire to expend as much as time as others. He acknowledged that Creve Coeur Hockey Club follows U.S.A. Hockey Club's age guideline rules.
Mr. Lovicchio testified that until 1992 the Creve Coeur house program offered play only within the Creve Coeur Hockey Club. Subsequently, parents and others pushed for interleague play with teams in Affton, Webster, Valley, Granite City, and other areas. Interleague play began in 1992 for Mini-Mites, Mites, and Squirts in house programs.
Mr. Lovicchio states that he is familiar with Mark and has observed that Mark is a "head taller" than others in the Mite level and taller than many in the Squirt level. He watched Mark skate at the January 25, 1996 *222 evaluation. Mr. Lovicchio observed, "his skating was slow, yet controlled but without the assistance of his brother constantly, with tugging him on the arm to go left or right, the child would wander." Mr. Lovicchio continued,
in a game situation it would be much more difficult because with the brother on the ice or Mr. Elitt, you are introducing another player out there, another coach out there. As and [sic] aside, for many years at the Mini-Mite and Mite level, Creve Coeur house league had coaching on the ice. That was a detriment to the game and because of that we would not play other clubs.
So for the last four years now, I am sorry, let me rephrase, for the last three years, there has been no coaching from the ice during the games at any level. At the house level, we actually do not let them on the ice. It would be impossible to play other clubs, in fact, even if Mr. Elitt or his brother were on the ice with the child, I can tell you they would not play us. It is as simple as that.
Mr. Lovicchio addressed the issue of Mark's request to play down at another level as follows:
[Q]: Do you have any knowledge with respect to the Creve Coeur Hockey Club, that anyone, with respect also to the house program, that anyone has been permitted to play down from the Squirt or Pee-Wee level to the Mite level or any other level below there actual correct age level?
[A]: We have never had any situation like that. It has never even been requested as long as I have with the club. Since we are affiliated with U.S.A. Hockey and they provide the insurance agents for the insurability provided with U.S.A. Hockey, we have to follow there [sic] age guidelines to the letter and if we allowed someone to play down, without getting approval from the insurance or from the insurance body, it would void all insurance for all participants on the ice and the coaches during practices or games. As I have said many times, it is merely a case of insurability.
Mr. Lovicchio noted,
U.S.A. Hockey spent many, many years trying or getting testing and so forth to develop age guidelines. That was based on the physiological factor, of the maturity of the body, weight, height, motor skills, and so forth.
And when they determined those age levels, the insurance was then based on the fact those age levels would be maintained, we followed those age levels. So you wouldn't have someone in a different age group playing down with children smaller, with different motor skills and so forth.
Mr. Lovicchio concluded that there would be an increased safety risk with older, larger children playing down with other children. He concluded that permitting another person on the ice during house program games would alter the game situation, affecting the balance and positioning of the players and the movement of the puck. It would introduce another safety factor in the game.
Steven Dioneda, a thirty-eight year old licensed attorney, has continually played hockey since he was eleven. He has played in twenty expansion league championships and one year of low level minor league hockey. Mr. Dioneda has also been a coach and instructor at all age and skill levels, including his current position as instructor for Gateway Hockey. In his twenty-six years of experience, he has never heard of anyone playing down to a lower age level. Mr. Dioneda believes that the "safety factor" led to the institution of age levels set up on two-year intervals. This would prevent large children from playing with small ones. It is his belief that hockey is an extremely quick game at any age level; that the play of the game changes rapidly and that body checking occurs at all age levels. Furthermore, because of the nature of the game, he believes that physical contact occurs frequently. Mr. Dioneda has never experienced a game when two players did not collide. Finally, he has never heard of anyone (besides the players) being on the ice and would not recommend it except in a coaching situation. Even in a practice situation, Mr. Dioneda believes that it would be extremely disruptive. He believes that assigning a person to a particular player on the ice would change the game.

*223 Analysis

Before addressing the issue of injunctive relief, this Court must determine, as a threshold matter, whether subject matter jurisdiction exists. Turner v. Armontrout, 922 F.2d 492, 493 (8th Cir.1991) (citing Kronholm v. FDIC, 915 F.2d 1171, 1174 (8th Cir.1990)). In this case, plaintiffs fail to establish subject matter jurisdiction because defendants do not fall within the provisions of Subchapter III of the ADA. The anti-discrimination provision of Subchapter III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment ... of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of accommodation. 42 U.S.C. § 12182(a) (emphasis added). Under the test, plaintiffs must first show denial of access to a place of public accommodation. Plaintiffs make no such showing because they allege denial of participation in the youth hockey league instead of denial of access to a place of accommodation, i.e. the ice rink. In order for the Elitts to have an actionable claim, they must show that defendants Creve Coeur Hockey and U.S.A. Hockey fit within the definition of place of public accommodation.
Section 12181(7) lists twelve different categories of public accommodations, including hotels, restaurants, grocery stores, and gymnasiums. 42 U.S.C. § 12181(7). Although not an exhaustive list, section 12181(7) focuses on places of public access and does not list membership organizations under any of the twelve categories. Therefore, this Court finds that membership organizations such as Creve Coeur Hockey and U.S.A. Hockey do not constitute places of public accommodation. See Stoutenborough v. National Football League, 59 F.3d 580, 583 (6th Cir.) (National Football League, media networks, and local media affiliates do not fit under the definition of places of public accommodation), cert. denied, ___ U.S. ___, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995). Furthermore, membership organizations are not sufficiently similar to any of the listed private entities in § 12181(7) to justify their inclusion as places of public accommodation.
This Court also applies Title II of the Civil Rights Act of 1964 for instructive analysis. Similar to the ADA, Title II mandates equal access in places of public accommodation. 42 U.S.C. § 2000a. Section 2000a(b) lists certain private entities as places of public accommodation, including hotels, restaurants, and sports arenas. Id. Courts have generally excluded membership organizations from the definition of public accommodation based on a plain reading of Title II. Welsh v. Boy Scouts of Am., 993 F.2d 1267, 1269-70 (7th Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993); Clegg v. Cult Awareness Network, 18 F.3d 752, 755 (9th Cir.1994). However, organizations may qualify as places of public accommodation when they are "affiliated with a place open to the public and membership in the organization is a necessary predicate to [make] use of the facility." Clegg, 18 F.3d at 756; See also Welsh, 993 F.2d at 1272 ("when the organization functions as a `ticket' to admission to a facility or location" (quoting United States Jaycees v. Massachusetts Comm'n Against Discrim., 391 Mass. 594, 463 N.E.2d 1151, 1159 (1984))).
By applying Title II caselaw as persuasive authority, this Court finds that U.S.A. Hockey and Creve Coeur Hockey do not meet the standard for places of public accommodation.
Because plaintiffs fail to show denial of access to a place of public accommodation, their claims do not fall under the ADA, Subchapter III. Even if plaintiffs did show denial of access to a place of public accommodation, they fail to meet the second part of the test, i.e. did defendants own, operate, lease (or lease to) a place of public accommodation. 42 U.S.C. § 12182(a). Plaintiffs did not introduce any evidence during the evidentiary hearings to make the necessary connection between defendants Creve Coeur Hockey and U.S.A. Hockey and the ice rink. Consequently, subject matter jurisdiction does not exist in this case.
Even if subject matter jurisdiction existed, this Court would not grant injunctive relief. Under the well known Dataphase test, courts consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury *224 that granting the injunction will inflict upon other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." Goff v. Harper, 60 F.3d 518, 520 (8th Cir.1995) (quoting Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 114 (8th Cir.1981)).
First, plaintiffs show threat of irreparable harm. Although plaintiffs admit that an injunction would not allow Mark to play this season, an injunction would permit Mark to play the following season. Without an injunction, Mark could lose the opportunity to play in 1996-97, as this litigation could extend past the 1996-97 season. This lost opportunity could not later be compensated by an award of money damages. As a result, threat of irreparable harm exists.
As for the rest of the Dataphase factors, this Court finds that defendants prevail. If the Court awarded injunctive relief, the harm inflicted on defendants would clearly outweigh the threat of irreparable harm to plaintiffs. This is because Mark presents a safety concern if he were allowed to play down to the Squirt level. Although the house program prohibits checking and Mark does not appear to be aggressive, witnesses testified that ice hockey inevitably involves incidental contact. The chance of an accidental collision also increases when a player such as Mark frequently loses his focus. Therefore, the combination of Mark's A.D.D. and larger size increases the chance of accidental collision as well as the risk of injury to younger and generally smaller-sized children.
The Court also notes that the safety concern is linked to insurance liability, a second harm inflicted on defendants. If Mark played down to the Squirt level, defendant Creve Coeur Hockey would expose themselves to insurance liability by not following U.S.A. Hockey age guidelines. Testimony revealed that going against age guidelines could void insurance coverage for all participants on the ice, including players and coaches.
Finally, the appearance of Mark's brother or father on the ice would be a disruption to others during the competitive scrimmages. Their presence would disrupt the flow and generally change the nature of the game. Also, testimony revealed that house programs from outside the Creve Coeur area would not scrimmage with Creve Coeur if other persons (besides the players) stayed on the ice. Players in the Squirt level house program would not fully experience the conditions of a regular scrimmage. Consequently, defendants would bear many types of harm that outweigh the threat of irreparable harm suffered by plaintiffs.
The third Dataphase factor  probability that movant will succeed on the merits  weighs in favor of defendants. As stated above, plaintiffs could not prevail at trial on the merits because this Court lacks subject matter jurisdiction. Furthermore, aside from jurisdictional concerns, plaintiffs could not prevail under other aspects of the ADA. Plaintiffs allege that defendants violate the ADA by failing to make reasonable modifications for Mark. No one disputes that Mark is in fact a disabled individual.[2] Therefore, under Subchapter III of the ADA, plaintiffs would prevail unless the requested modifications are unreasonable. 42 U.S.C. § 12182.
The U.S. Supreme Court has held that "reasonable accommodation" does not include "undue financial and administrative burdens" or "a fundamental alteration in the nature of [the] program." School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (quoting Southeastern Commun. College v. Davis, 442 U.S. 397, 412, 410, 99 S.Ct. 2361, 2370, 2369, 60 L.Ed.2d 980 (1979)). This Court finds that the requested modifications would not be reasonable, with respect to the competitive phase of the house program. For example, placing Mark's brother or father on the ice would fundamentally alter the *225 nature of scrimmages, an important part of the house program. As stated above, their presence would disrupt the flow of play and prevent players from experiencing conditions of a regular scrimmage. Testimony also revealed that their presence would cause teams outside of the Creve Coeur area to stop scrimmaging with Creve Coeur house programs.
If Mark played down to the Squirt level, his participation would fundamentally alter the house program. U.S.A. Hockey's age levels are important because they group players who are roughly the same skill and size. As stated above, Mark has focusing problems and would generally be larger than the average Squirt level player. These two factors would increase the chances of accidental collision as well as the risk of injury to younger and smaller-sized children. In short, Mark's participation in the lower age group would be too disruptive, thus fundamentally altering the house program.
Additionally, if Mark played down to the Squirt level, such a move would be unreasonable as an undue financial and administrative burden. Testimony showed that defendant Creve Coeur Hockey would expose themselves to insurance liability by not following U.S.A. Hockey age guidelines. Going against age guidelines could void insurance coverage for all participants, thus exposing defendants to undue financial risks.
Because plaintiffs seek unreasonable modifications, they do not show a probability of prevailing on the merits.
Plaintiffs also fail to establish the fourth Dataphase factor, public interest. Generally speaking, it would be in the public interest to accommodate an individual's disabilities. However, when requested accommodations are unreasonable, as in this case, this Court finds no public interest in forcing their implementation.
Consequently, plaintiffs can only show threat of irreparable harm, and the three remaining Dataphase factors weigh in favor of defendants. This Court finds that injunctive relief would be unwarranted.
For reasons stated above,
IT IS HEREBY ORDERED that plaintiffs' Motions for a Temporary Restraining Order and a Preliminary Injunction be DENIED.
IT IS FURTHER ORDERED that plaintiff's complaint be DISMISSED for lack of subject matter jurisdiction.
NOTES
[1] Plaintiffs also file suit under the Missouri Visual, Hearing and Physical Disabilities Act, Mo. Rev.Stat. § 209.150. However, on February 26, 1996, this Court granted defendants' Motions to Compel Arbitration and Stay Litigation regarding the state claim but denied the same motions regarding the ADA claim.
[2] Defendants attempt to show that Mark Elitt is not an "qualified individual with a disability." However, this Court notes that such statutory language and caselaw interpreting the language deals with Subchapter II of the ADA, 42 U.S.C. § 12132. See Pottgen v. Missouri State High Sch. Activities Assoc., 40 F.3d 926, 930-31 (8th Cir. 1994). Mark Elitt's case, though, involves Subchapter III of the ADA, which only requires a plaintiff to be disabled, not a "qualified individual with a disability." 42 U.S.C. § 12182.