Anthony MATTHEWS, Plaintiff,

v.

The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, PAC–10 Athletic Conference; Washington State University, Defendant.

No. CS–99–0264–WFN.

United States District Court,
E.D. Washington.

Dec. 1, 1999.

1200

Richard H. Wooster, Tacoma, WA, for Anthony Matthews.

Chris Burford, Walnut Creek, CA, for PAC–10.

John Salmon, for WSU.

## ORDER

NIELSEN, Chief Judge.

A telephonic hearing was held in this matter on November 10, 1999. Richard Wooster participated on behalf of Plaintiff; Paul Taylor participated on behalf of Defendant National Collegiate Athletic Association [NCAA]; Chris Burford participated on behalf of Defendant PAC–10 Athletic Conference [PAC–10]; and John Salmon participated on behalf of Defendant Washington State University [WSU]. The Court has reviewed the file and the briefing, and is fully informed.

## I. BACKGROUND

Plaintiff Anthony Matthews is a redshirt sophomore member of the WSU football team. He began his college career at WSU during the fall of 1997, and has played one season of intercollegiate football. Defendant NCAA is an unincorporated association that oversees collegiate amateur athletics. It has certain minimum

academic requirements that student athletes must meet in order to participate in intercollegiate football games. Among these requirements is the so-called "75/25 Rule" established by NCAA Bylaw 14.4.3.1.3. This rule provides:

A student-athlete shall earn at least 75 percent of the minimum number of semester ... hours required for satisfactory progress during the academic year. The student-athlete shall earn no more than 25 percent of the minimum number of semester ... hours required for satisfactory progress during the summer.

Defendant NCAA's stated purpose for this rule is to ensure that student athletes maintain a course load equivalent to that of the general student body. Decl. of Kevin C. Lemmon at 2. It was passed in response to concerns of various member institutions that student athletes excessively used summer school courses to maintain eligibility, isolating student athletes from other students and resulting in declining academic opportunities for the athletes themselves. *Id.* Also, the rule addressed the concern that summer school classes are often of less substance than courses offered during the regular academic year. *Id.* The overriding purpose of the rule was to focus student athletes on the considerable amount of attention that should be paid to academic work.

Defendant NCAA declared Plaintiff academically ineligible to play during the 1999 football season on the grounds that he violated the 75/25 Rule during the 1998–99 school year. Plaintiff completed seven credits during the Fall 1998 semester, nine credits during the Spring 1999 semester, and nine credits during the Summer 1999 semester. Academic Record of Anthony Matthews. Therefore, Plaintiff completed only 64% of his required course load during the regular academic year.

Plaintiff previously was diagnosed with a learning disability that significantly impairs his ability to read and write, thereby interfering with his academic achievement. Defendant NCAA does not dispute the existence of this disability. In fact, the NCAA granted Plaintiff waivers from various academic requirements for both the 1997 and 1998 football seasons. In October, 1997, Plaintiff received a waiver that permitted him to take nine credit hours per semester instead of the usual 12 units. In August, 1998, Plaintiff received a waiver of the 75/25 Rule. On August 20, 1999, Plaintiff submitted an application for another waiver of the 75/25 Rule on the basis of his learning disability. On August 31, 1999, the Satisfactory Progress Waiver Committee of the NCAA denied this application. No hearing was held, nor written denial issued. The NCAA alleges that Plaintiff's application was rejected because his academic performance had not improved despite two previous waivers. When the NCAA did not respond to Plaintiff's request to reconsider its decision, Plaintiff filed this action.

On October 5, 1999, this Court entered a Temporary Restraining Order against the NCAA, enjoining the NCAA from declaring Plaintiff academically ineligible and from prohibiting WSU from allowing Plaintiff to participate in intercollegiate football. Plaintiff subsequently added Defendants PAC–10, and WSU as a necessary party.[1] On October 22, 1999, this Court expanded the previous Temporary Restraining Order to include the two new Defendants. This Court now considers Plaintiff's Application for a Preliminary Injunction.

## II. ANALYSIS

■ *Preliminary Injunction.* The Court has broad discretion to grant or deny a party's request for injunctive relief. *Half Moon Bay Fishermans' Marketing Assoc. v. Carlucci,* 857 F.2d 505, 507 (9th Cir.1988). A preliminary injunction is an extraordinary remedy. *Weinberger v.*

---

1. WSU has not declared Plaintiff academically ineligible, nor has it threatened to do so. WSU merely was added as a necessary party to this suit. All future general references to "Defendants" refer to Defendants NCAA and PAC–10.

*Romero–Barcelo,* 456 U.S. 305, 311–12, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980). The Ninth Circuit has noted that

> [t]raditionally, a preliminary injunction is an equitable remedy granted where the moving party shows, (1) a likelihood of success on the merits, (2) a possibility of irreparable injury if the preliminary injunction is not issued, (3) a balance of hardships tipping decidedly in its favor, and (4) in some cases that granting the preliminary injunction will be in the public interest.

*Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1212–13 (9th Cir.1984).

 The standard in this Circuit for the entry of a preliminary injunction is as follows:

> "To obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." *Apple Computer,* 725 F.2d at 523; *see also Los Angeles Memorial Coliseum,* 634 F.2d at 1200–

01. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *See* 634 F.2d at 1201. Under any formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury.

*Oakland Tribune, Inc. v. Chronicle Publishing Co., Inc.,* 762 F.2d 1374, 1376 (9th Cir.1985); *Associated General Contractors of California, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir.1991). To show irreparable injury, a Plaintiff must show an immediate threatened injury for which there is no adequate remedy at law. *Associated General Contractors,* 950 F.2d at 1410.

### Americans With Disabilities Act.

Plaintiff contends that Defendants violated Title III of the Americans With Disabilities Act [ADA], 42 U.S.C. § 12181, *et seq.,* by failing to reasonably accommodate Plaintiff's learning disability.[2] The relevant portion of the ADA provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person

---

**2.** Plaintiff also alleges violation of the Washington Law Against Discrimination, R.C.W. 40.60.010, *et seq.* The Parties' arguments ignore this allegation and focus on the applicability and requirements under the ADA. The Court notes that this provision is similar to the relevant portion of the ADA, and many of the concerns raised by application of the ADA also apply to the Washington statute.

> The Washington Law Against Discrimination establishes:
> The right to be free from discrimination because of ... the presence of any sensory, mental, or physical disability ... is recognized as and declared to be a civil right. This right shall include, but not be limited to ... [t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement.

R.C.W. 40.60.030(1)(b).

> "Any place of public resort, accommodation, assemblage, or amusement" is relevantly defined as follows:
>> any place, licensed or unlicensed, kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities, whether conducted for the entertainment, housing, or lodging of transient guests, or for the benefit, use, or accommodation of those seeking health, recreation, or rest, ... or for the rendering of personal services, or where public amusement, entertainment, sports, or recreation of any kind is offered with or without charge, ... or where the public gathers, congregates, or assembles for amusement, recreation, or public purposes, ... or educational institution.

R.C.W. 42.60.040(10).

who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a).

Private entities are considered public accommodations under the ADA if the operations of such entities affect commerce and, in this specific instance, include "an auditorium, convention center, lecture hall, or other place of public gathering," "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation," or "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education." 42 U.S.C. § 12181(7)(D), (L) and (J). "Discrimination" is relevantly defined under the ADA as follows:

> (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered, [or] (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(i) and (ii).

■ The ADA does not distinguish between sports organizations and other entities when considering whether its provisions apply. *Martin v. PGA Tour, Inc.*, 994 F.Supp. 1242, 1246 (D.Or.1998). To establish a prima facie case of discrimination in violation of the ADA, Plaintiff must produce evidence that (1) he is disabled

under the ADA, (2) he can meet the essential eligibility requirements established by the Defendants with or without reasonable accommodation, (3) he is prevented from participation solely because of his disability, and (4) Defendants are entities to which the ADA applies. *Wong v. The Regents of the Univ. of California*, 192 F.3d 807, 816 (9th Cir.1999), citing *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir.1999).

■ A plaintiff has the burden of demonstrating the existence of his disability, the reasonableness of a requested modification, and his ability to qualify for an organization's essential eligibility requirements. *Wong*, 192 F.3d at 816; *Martin*, 994 F.Supp. at 1248. Once a plaintiff carries his burden, and a court determines that the ADA in fact applies, then the defendant must provide the accommodation unless it can show that the accommodation would fundamentally alter the essential eligibility requirements because the accommodation is not reasonable or the individual is not qualified. *Wong*, 192 F.3d at 816. The issue of reasonableness depends on the individual circumstances of each case. *Id.* at 818. When any court applies the ADA, it must examine the facts specific to the case and the disabled individual's circumstances, and the accommodations that might allow him to participate. *Id.*, citing *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir.1996).

Defendants do not dispute that Plaintiff suffers from a disability to which the ADA applies. Defendants instead contend that Plaintiff cannot meet the remaining three requirements.

■ *Applicability of the ADA to Defendants*. Few courts have considered actions by the NCAA in light of the ADA, and those that have generally have not directly addressed the question of whether the ADA applies to the NCAA.[3] One court

---

**3.** Defendant PAC–10 joined the NCAA's Opposition to Plaintiff's Motion for a Preliminary Injunction. Ct. Rec. 25. Therefore, all arguments addressing application of the ADA to the NCAA also address the PAC–10.

analyzed the NCAA's actions as if the ADA applied to them, but later stated that the court "need not resolve [whether the NCAA is or operates a place of public accommodation under the ADA] in order to rule on Plaintiff's motion for a preliminary injunction." *Bowers v. National Collegiate Athletic Association,* 974 F.Supp. 459, 467, note 4 (D.N.J.1997) (holding that NCAA academic rules are essential eligibility requirements not required to be waived by the ADA). Another court did directly address the issue. It held that the ADA applies to the NCAA because the NCAA is an operator of the athletic facilities of its member institutions due to the extensive amount of control exerted by the NCAA over these facilities. *Tatum v. National Collegiate Athletic Association,* 992 F.Supp. 1114, 1120 (E.D. Mo.1998). However, the *Tatum* court cited the NCAA's control over ticket prices, types of goods sold, concession profits, press access and access to stadiums for athletic contests. *Id.* Affidavits in the instant case show the above cited facts to be incorrect.

Plaintiffs contend that the ADA applies to the NCAA. His argument is that a "place of public accommodation" includes not only physical structures and locations, but also services and other intangibles. *See, e.g., Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.,* 37 F.3d 12, 18–20 (1st Cir.1994). The spirit of the ADA requires that its language be read broadly to forbid discrimination against disabled individuals in a variety of ways, including use of eligibility criteria that screens out or tends to screen out disabled persons. In turn, Defendants argue that they simply do not fall under the purview of the ADA. This argument has two parts. First, Defendants claim they are not places of public accommodation because all such places under the ADA are physical locations. Defendants are merely unincorporated athletic associations. Second, Defendants contend that only an operator of a place of public accommodation falls under the ADA, and Defendants are not such operators.

Traditionally, places of public accommodation are considered to be physical "places." *Elitt v. USA Hockey,* 922 F.Supp. 217, 223 (E.D.Mo.1996). In *Elitt,* the defendant hockey organization was found not subject to the ADA because membership organizations are not places. *Id.* An organization sponsoring a bicycle race and the National Football League similarly are not public accommodations because they are not actual "places." *See Brown v. 1995 Tenet ParaAmerica Bicycle Challenge,* 959 F.Supp. 496, 499 (N.D.Ill. 1997); *Stoutenborough v. National Football League, Inc.,* 59 F.3d 580, 583 (6th Cir.), *cert. denied,* 516 U.S. 1028, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995).

Plaintiff cites several cases stating that organizations may qualify as places of public accommodation when they are affiliated with a place open to the public or when membership in an organization is a necessary predicate to use a facility. *Stoutenborough,* 59 F.3d at 583; *Clegg v. Cult Awareness Network,* 18 F.3d 752, 755 (9th Cir.1994). Even if an organization might qualify as a place of public accommodation under such circumstances, no such circumstances are present here. Defendants are not affiliated with any specific place open to the public. They have no strong association with any particular athletic venue or venues. Furthermore, persons or entities are not required to be members of the NCAA or the PAC–10 in order to enter or use various football stadiums and other athletic facilities in which member athletes of the NCAA and PAC–10 perform as members of their school teams. Thus, Defendants neither are places of public accommodation, nor affiliated closely enough with a place of public accommodation to be considered one.

Furthermore, Defendants are not "operators" of any place of public accommodation. No party argues that football stadiums or other collegiate athletic facilities are not themselves places of public accommodation. However, a facility being a place of public accommodation does not

mean that Defendants are operators of that public accommodation merely because events sanctioned by them occur there. In the instant case, Defendants do not regulate hours of operation, specify staffing requirements, maintain on-site or off-site employees, obtain revenue from operation, or determine who may enter their members' facilities. Decl. Of Kevin C. Lemmon at 2. Member institutions independently set ticket prices, sell tickets, schedule their in-season competitions, determine the location of each competition, set the prices and control the sale of concessions, and control media access to and broadcast of competitions. *Id.* at 3. Defendants have no direct control over any of the facilities used by member institutions. They cannot be said to operate any facilities used by member institutions' student-athletes for practice or competition purposes.

In light of the foregoing analysis, it appears that the ADA does not apply to the NCAA. The NCAA regulates only the eligibility and membership criteria of its member institutions and their student-athletes. The list of eligible persons and institutions generated by Defendants' criteria is not a traditional physical place of public accommodation, nor is it associated with a particular place of public accommodation. Furthermore, Defendants do not operate any of their member institutions' places of public accommodation. Defendants simply do not fall within the scope of the ADA.

**Reasonable Accommodation.** Even if the ADA were to apply to Defendants, Plaintiff could not demonstrate a likelihood of prevailing on the merits of his claim to support a preliminary injunction because Defendants made reasonable accommodations for Plaintiff. Ordering any further accommodation would require Defendants to dispense with essential eligibility criteria, which is beyond the accommodation required under the ADA.

One of Defendants' primary purposes is to ensure that student athletes succeed in the "student" as well as the "athlete" portion of their college experience. The ex-

tensive NCAA bylaws addressing minimum academic eligibility requirements, the existence of academically-oriented NCAA committees such as the Satisfactory Progress Waiver Committee, and the dialogue occurring between Defendants and their member institutions regarding academic concerns all indicate the academic focus of Defendants. Unlike the Professional Golf Association or children's baseball leagues, Defendants' purpose is not merely to regulate or maintain the quality of play on the field. *Martin,* 994 F.Supp. at 1245–46; *Shultz v. Hemet Youth Pony League, Inc.,* 943 F.Supp. 1222, 1224 (C.D.Cal.1996) ("[t]here are no other eligibility criteria" except for a participant's legal age, geographic location, and payment of the registration fee); *Anderson v. Little League Baseball Inc.,* 794 F.Supp. 342 (D.Ariz. 1992). Defendants oversee collegiate student-athletes. The "student" portion of this moniker regularly is included in Defendants' references to competitors, and many of Defendants' rules address the academic component of a collegiate athlete's responsibilities. One of Defendants' primary purposes is to support academic success of athletes.

The 75/25 Rule is an important component of Defendants' academic regulations. It was passed with the intention of ensuring "that student-athletes maintain a course load equivalent to the general student body." Decl. of Kevin Lemmon at 2. Defendants were concerned with athletes taking summer school classes, which are frequently less substantial than those offered during the year, and the resulting declining academic opportunities for student-athletes. *Id.* Even Plaintiff's coach, WSU football Coach Mike Price, strongly supports the Rule as "one of the better rules that we have had in the NCAA, because it keeps players on track to graduate." Decl. of Mike Price at 6.

Defendants have twice granted Plaintiff a waiver from various academic requirements, including the 75/25 Rule. In October, 1997, Plaintiff was granted a waiver

from the requirement that he take a minimum of 12 course units per semester. Defendant NCAA's Opposition to Plaintiff's Motion for Temporary Restraining Order, Exh. 1 at 2 ["Waiver App."]; NCAA Bylaw 14.1.6.2.2.1.3. This waiver apparently remained in effect during the next academic year as well-Defendants did not express concern that Plaintiff earned only seven and nine units respectively during the Fall 1998 and Spring 1999 semesters. Academic Record of Anthony Matthews. In August, 1998, Plaintiff was granted a waiver from the 75/25 Rule. Waiver App. at 2; NCAA Bylaw 14.4.3.1.3.2. These waivers were granted to Plaintiff in light of his learning disability. Waiver App. at 1; Decl. of Brad Bertani at 2–3.

Despite these waivers, Plaintiff still could not meet Defendants' essential eligibility requirements. Plaintiff could not satisfy the 75/25 Rule while in receipt of a waiver of the 12 course-unit-per-semester requirement. His academic performance did not improve to an acceptable level after two reprieves and two years to adjust to college courses. Evidence shows that Plaintiff was not even attending some of his classes during the waiver period—Professor Anne M. Kelleher, the instructor for Plaintiff's Fall 1999 Criminal Justice 150 course, states that Plaintiff attended class on only 18 of the 34 days that she recorded attendance. Plaintiff claims, and his academic records corroborate, that he dropped this class, but this attendance record indicates serious academic concerns.

Plaintiff simply cannot satisfy Defendants' essential academic requirements, even with two accommodations. To require Defendants to continually issue waivers of its requirements for Plaintiff would be to completely dispense with its essential requirements. This is something that the ADA does not require.

***Due Process Claim.*** Plaintiff also brings a 42 U.S.C. § 1983 claim for violation of his due process rights due to the NCAA's denial of his application for a waiver of the 75/25 Rule without communicating directly with Plaintiff or holding a pre- or post-decision hearing.

The Supreme Court has held that the NCAA is not a state actor. *National Collegiate Athletic Association v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). The facts are somewhat dissimilar. Basketball coach Jerry Tarkanian claimed a violation of his due process rights when the University of Nevada, Las Vegas, suspended him from coaching. Tarkanian was suspended because the NCAA placed UNLV on probation and threatened further penalties unless UNLV severed its ties with Tarkanian because Tarkanian had violated 10 NCAA rules. The Court held that the NCAA neither exercised nor held governmental power when it threatened to expel a state university from membership if the university did not take specified action. *Tarkanian,* 488 U.S. at 197, 109 S.Ct. 454. Instead, the university chose to conduct its athletic program in compliance with the NCAA's policies in order to maintain NCAA membership. *Id.* at 199, 109 S.Ct. 454.

In the instant case, Plaintiff's concern is the lack of communication between himself and the NCAA, and the lack of a hearing to discuss the NCAA's determination. This concern does not change the fact the NCAA is a private, unincorporated association rather than a state actor. Furthermore, the NCAA "does not take action against student-athletes, but only against member institutions." Decl. of Kevin C. Lemmon at 1. This stance agrees with the determination of the *Tarkanian* court— the individual member institutions choose to comply with the NCAA's rules. An NCAA determination is communicated to the affected member institution rather than to a non-complying individual so that the member institution can make a decision regarding its compliance with NCAA regulations. Plaintiff had no procedural guarantee of a direct communication with the waiver committee; indeed, such communication was never contemplated. In any case, the NCAA is not a state actor.

While WSU's decision not to use Plaintiff in intercollegiate football games undoubtedly was a direct result of the NCAA's determination, the NCAA did not make the ultimate decision to sideline Plaintiff.

■ This Court finds that Plaintiff cannot show a likelihood of success on the merits for any of his claims. The ADA does not appear to apply to Defendants NCAA and PAC–10 and, even if it were found to apply, Defendants already made reasonable accommodations. Plaintiff's due process claim similarly is unlikely to succeed. Additionally, Plaintiff cannot show irreparable injury as a result of Defendants' actions. At the time of this Preliminary Injunction hearing, only three football games remained in WSU's current season. Plaintiff, by taking an appropriate ratio of classes and successfully completing his other academic requirements, can qualify to play for his remaining two eligible seasons. Missing the chance to play in three football games is not the type of irreparable injury contemplated by the award of a preliminary injunction. Accordingly,

**IT IS ORDERED THAT:**

1. Plaintiff's Motion for Preliminary Injunction, Ct. Rec. 7, is **DENIED**.

2. The Amended Temporary Restraining Order issued by this Court on October 22, 1999, Ct. Rec. 22, is **VACATED**.

The District Court Executive is directed to file this Order and provide copies to counsel.