Andrew H.K. WONG, Plaintiff–
Appellant,

v.

THE REGENTS OF THE UNIVER-
SITY OF CALIFORNIA, Defen-
dant–Appellee.

No. 98–15757.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1999

Filed Sept. 16, 1999

As Amended Nov. 19, 1999.

Dan Siegel and Hunter Pyle, Siegel & Yee, Oakland, California, for the plaintiff-appellant.

Michael T. Lucey, Diane R. Crowley, and Greta W. Schnetzler, Gordon & Rees, San Francisco, California, for the defendant-appellee.

Before: PHYLLIS A. KRAVITCH,[1] STEPHEN REINHARDT, and THOMAS G. NELSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Plaintiff-appellant Andrew H.K. Wong appeals the district court's order granting summary judgment in favor of defendant-appellee Regents of the University of California ("the University") on Wong's claim that the University discriminated against him in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("the ADA") and section 504 of the Rehabilitation Act, 29 U.S.C. § 794.[2] Wong alleges that the University violated the Acts when, after refusing to grant his request for accommodation of his learning disability, it dismissed him for failing to meet its academic requirements. The district court ruled that summary judgment was appropriate on two grounds: (1) the accommodation Wong requested was not reasonable, and (2) Wong was not qualified to continue his course of study in the School of Medicine because with or without accommodation, he could not perform the tasks required of an effective medical doctor. We conclude, however, that Wong created a question of fact with respect to both of these issues and that the district court therefore erred in granting the University's motion.

## I. FACTS[3]

After excelling in his undergraduate and master's degree programs, Wong entered the School of Medicine at the University of California at Davis in the fall of 1989. The School of Medicine consists of a four-year curriculum: typically, in the first two

---

1. The Honorable Phyllis A. Kravitch, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

2. The ADA and the Rehabilitation Act, as they apply to the parties in this case, create the same rights and obligations. *See Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir.1999). In the remainder of this opinion, we sometimes refer to these two statutes jointly as "the Acts."

3. For purposes of summary judgment, we interpret the facts in the light most favorable to Wong, the non-moving party. *See Confederated Tribes of Siletz Indians v. Oregon*, 143 F.3d 481, 484 (9th Cir.1998). In this case, however, the facts are largely undisputed, and unless otherwise noted, the parties concur that the relevant events occurred as we describe them in the text.

years, students take academic courses in basic sciences; in the third year, they complete six consecutive clinical "clerkships" in core areas of medical practice; and in the fourth year, they take a series of more specialized clerkships. The clinical clerkships teach the students to integrate their academic knowledge with the skills necessary to practice medicine and test them on their progress in developing these skills.

Wong completed the first two years of medical school on a normal schedule and with a grade point average slightly above a "B"; he also passed the required national board examination immediately following the second year. He began his third year on schedule, enrolling in the Surgery clerkship in the summer of 1991 and, upon its conclusion, in the Medicine clerkship. When he was approximately four weeks into the Medicine clerkship, Wong learned that he had failed Surgery. In accordance with school policy, Wong appeared before the Student Evaluation Committee ("SEC"), a body that meets with students having academic problems and makes recommendations to another group, the Promotions Board, which ultimately decides what action, if any, the school should take with respect to that student. The Promotions Board placed Wong on academic probation, decided that he should repeat the Surgery clerkship, and recommended that he continue in the Medicine clerkship at least until the midterm evaluation. Wong withdrew from the Medicine clerkship in November 1991 when his midterm evaluation showed significant problems with his performance to that point. Wong's instructor of record then assigned a senior resident to work with Wong one-on-one, focusing upon taking patient histories and making oral presentations. These sessions continued through the winter of 1992.

In March 1992, Dr. Ernest Lewis, associate dean of student affairs, granted Wong's request to take time off from

school to be with his father, who had just been diagnosed with lung cancer. Wong spent at least some of this time doing extra reading in preparation for his upcoming clerkships, Psychiatry and Pediatrics. He returned to school in July 1992 and between July and December passed clerkships in Psychiatry (with a "B"), Pediatrics ("C+"), and Obstetrics/Gynecology ("C"). Wong generally received positive comments on his final evaluation forms for these courses. Instructors noted that he was "competent," "prompt," "enthusiastic," "a very hard worker," and "an extremely pleasant student who related exceptionally well with the staff"; they also stated that he had "a good fund of knowledge," "contributed meaningfully to the discussions at hand," "made astute observations of patients," and "did a good job of presenting on [gynecology] rounds."[4] Evaluators also observed, however, that Wong "seem[ed] to have difficulty putting things together" and "limited abilities to effectively communicate his thoughts," and they recommended that he work on "organizational skills" and "setting priorities."[5]

Wong re-enrolled in the Medicine clerkship in January 1993. Three weeks later, his father died, an event that by all accounts had a devastating impact on Wong. He continued in the Medicine clerkship for a brief period of time, but after his midterm evaluation showed a borderline performance in the first half of the clerkship, Wong, with Dean Lewis's approval, withdrew from the course and left the Davis campus to be closer to his family, who lived in the San Francisco area. In order to prevent Wong from falling further behind, Dean Lewis permitted him to take several fourth-year level clerkships at hospitals in the San Francisco area. He earned A's and B's in these courses, with positive comments. Two evaluators thought that Wong needed to improve his fund of knowledge, but both attributed the

---

4. Final Grades Sheets, Attach. to Decl. of Ernest Lewis, M.D., R17, Ex. C at 23–25.

5. *Id.*

deficiency to the fact that he was taking classes in the fourth-year curriculum without having completed his third year "core" clerkships.[6] When Wong returned to the School of Medicine at Davis in the summer of 1993, he again enrolled in Medicine. He asserts that although he did not feel prepared for this course and attempted to drop it, Dean Lewis did not permit the withdrawal, and he ultimately failed the class, triggering another appearance before the SEC and Promotions Board.

The Promotions Board adopted strict conditions for Wong to remain a student in the School of Medicine: it required him to take only reading electives for the next three quarters; to meet again with the SEC and Dean Lewis following that period to assess his progress; and, assuming he received approval to re-enter the clerkship program, to repeat the entire third year, including the courses he already had passed. During the meeting with the Promotions Board, Wong stated that he thought he might have a learning disability and learned from members of the Promotions Board about the University's Disability Resource Center ("DRC"). DRC staff members and doctors to whom they referred Wong administered a battery of tests and concluded that Wong has a disability that affects the way he processes verbal information and expresses himself verbally.[7]

When Dean Lewis learned the results of the tests, he referred Wong to Dr. Margaret Steward, a psychologist and School of Medicine faculty member, so that she could counsel him regarding coping skills and help him determine what accommodations would allow him to complete his courses successfully. Dr. Steward suggested several strategies for Wong to employ, including telling people that he has a "hearing problem" and may need them to slow down or repeat messages; using a tape recorder; and double-checking his understanding of information he has received verbally.[8] Dr. Steward reported to Dean Lewis in a memorandum that "[t]here is no doubt that [Wong] will need extra time to complete the clerkship years."[9] In the same memorandum, she also specifically recommended giving Wong extra time to read before his next two clerkships, Medicine and Surgery; in a later memorandum, she informed Dean Lewis that she had discussed with Wong that he needed to pass the Medicine clerkship to provide "empirical support" for extra reading time before his next clerkship and that "if he passes Medicine that he needs to anticipate extra time in order to complete the clerkship years."[10] Finally, Dr. Steward recommended that Dean

6. *See* Evaluations of Clerk, Ambulatory Care Clerkship, Attach. to Lewis Decl., R17, Ex. C at 947, 949. One of the evaluators stated that his knowledge base was "probably appropriate for his [third-year] level." *Id.* at 949.

7. One of the evaluations divided Wong's disability into two categories: "[r]eceptive language" and "[e]xpressive language." Mem. from Dr. Margaret Steward to Dean Lewis (April 14, 1994), Attach. to Lewis Decl., R17, Ex. C at 88. According to this description, Wong's problem with receptive language stems from his need to slow down information that others give him verbally by repeating their words to himself. Wong does not listen to the parts of the speaker's communication that occur while he is processing the previous message. *See id.* With respect to expressive language, Wong sometimes cannot find the words he needs to express his thoughts quick-

ly; to compensate, he uses gestures or substitutes generic words for technical terms. *See id.* Both aspects of the disability can result in significant miscommunication and anxiety, and having to deal with new, technical, or "not-quite-mastered" information exacerbates the problem. *Id.* at 88–89.

8. *See id.* at 90.

9. *Id.*

10. Mem. from Dr. Steward to Dean Lewis (May 14, 1994), Attach. to Lewis Decl., R17, Ex. C at 156. Wong asserts that Dr. Steward specifically told him that if he passed the first two clerkships (Medicine and Surgery) with the accommodation of extra reading time, the School of Medicine would consider granting him the same accommodation· for future clerkships.

Lewis assign Wong an "SLD [Student Learning Disability] advisor" with whom he could meet to review strategies for coping with his disability. Dean Lewis never appointed this advisor.[11] Wong also contends (and the University does not dispute) that Dr. Steward told him that the School of Medicine "would set up a learning disability resource team to ensure that Wong received adequate accommodations," but the school never did so.[12]

After completing the requisite three quarters of elective reading under the supervision of a faculty member, Wong planned to retake the Medicine clerkship in July 1994. After attending orientation, however, he felt unprepared for the course and asked for another eight weeks off for additional reading. Dean Lewis granted this request, although he noted that he did not know how the extra time would help Wong. In September 1994, Wong took and passed Medicine, earning a "B" and receiving overwhelmingly positive comments on his grade report, including observations of his "excellent fund of knowledge," "excellent retention of new material," and compassionate manner with patients as he performed effective physical exams and formulated diagnoses.[13] The instructor noted some difficulty in making verbal presentations, including uncertainty and taking extra time to answer, but concluded that Wong was a "solid third year medical student" who performed satisfactorily "in all areas of the clerkship."[14] Wong then received eight weeks off to read in preparation for his Surgery clerkship, which commenced in January 1995 and in which he earned a "B." The comments on his

grade report were similar to those for the preceding clerkship: generally positive remarks mitigated by reference to his need for time and a calm setting to make good oral presentations. The instructor of record concluded:

> [T]he department was very pleased with [Wong]'s performance on the clerkship. We thought that he had turned in a solid performance and that he had improved markedly over the past year. We think that he has everything it takes to become a safe and effective physician.[15]

Before completing the Surgery clerkship, Wong contacted Dean Lewis's office and requested eight weeks off to read for his next clerkship, Pediatrics. Dean Lewis denied this request through the registrar;[16] he has offered several different reasons for this decision, giving rise to an issue of fact on this point. In an October 1997 deposition, Dean Lewis stated that he received Wong's request through the registrar, who told him that Wong wanted time off for reading but also asked to intersperse fourth year electives with his remaining third year clerkships because he wanted to graduate on time without having to take the core clerkships in straight succession. According to Dean Lewis's testimony, he did not grant Wong's request because Wong needed to finish his third year before proceeding to fourth year courses and because giving Wong time off to read would keep him from graduating the following year.[17] Wong denies that he pressed for permission to take fourth year courses in order to keep from delaying his

---

11. *See id.*

12. Pl.'s Separate Statement of Disputed Facts at 16–17, ¶¶ 16, 16B, Attach. to Mem. in Opp'n to Mot. for Summ. J., R32.

13. Final Grade Sheet, Medicine Clerkship, Summer/Fall 1994, Attach. to Lewis Decl., R17, Ex. C at 8.

14. *Id.*

15. Final Grade Sheet, Surgery Clerkship, Winter 1995, Attach. to Lewis Decl., R17, Ex. C at 7.

16. The parties agree that they communicated about the accommodation only through the registrar; Dean Lewis did not meet personally with Wong to discuss his request for additional time off for reading. *See* District Ct. Order Granting Mot. for Summ. J., R37 at 14, 15 n. 7.

17. *See* Dep. of Dr. Ernest Lewis, R24, at 5–7.

graduation date; he contends that he only mentioned this alternative after Dean Lewis denied his request for eight weeks off to read for Pediatrics and told Wong that he must take courses in succession for the remainder of the year.[18]

In the same deposition, Dean Lewis also explained his denial of Wong's request for reading time as follows: Wong already had received time off before the previous two clerkships and had passed the Pediatrics clerkship three years earlier. For these reasons, Dean Lewis opined that Wong did not need the extra time for this Pediatrics clerkship. In the course of this explanation, however, Dean Lewis again mentioned his belief that Wong wanted to graduate on time; furthermore, Dean Lewis acknowledged that Pediatrics, as well as Obstetrics/Gynecology and Psychiatry, which he expected Wong to take in succession following Pediatrics, had become much more rigorous and demanding over the past few years.[19] Wong concurred in Dean Lewis's evaluation of the relative difficulty of the 1995 Pediatrics course as compared to the 1992 Pediatrics course.

Finally, in his December 1997 declaration, Dean Lewis repeated as reasons for denying Wong's requested accommodation that he already had granted Wong a significant amount of time off for additional reading and directed studies and that Wong previously had passed Pediatrics (and the next scheduled clerkship, Obstetrics/Gynecology) with no accommodation. Lewis also advanced a third set of explanations: "In that he was presumed to have previously read the material for those courses, I decided that allowing additional time off to read before repeating those clerkships would have been unreasonable, unfair to other students and contrary to the purposes of the curriculum." [20]

Wong received a "Y" grade in the Pediatrics clerkship. A "Y" signifies work of failing quality in one area of a clerkship; Wong's evaluations showed that he passed the written and oral examinations but that his ward performance was unsatisfactory. His final grade sheet reported that his "clinical judgment was poor" and that his evaluators "had concerns with his ability to synthesize information." [21] The grade sheet also noted reporting inaccuracies that in at least one instance "would have resulted in inappropriate dosages," [22] although Wong contends that his supervisor was responsible for this particular error. Some evaluators wondered whether Wong "could safely practice clinical medicine." [23] At the time Wong learned of his unsatisfactory performance in Pediatrics, he already had begun his Obstetrics/Gynecology clerkship. A preliminary report from his instructor in that course stated that for the first two weeks, Wong's performance had been "borderline" and "lower than expected." [24] This evaluation particularly noted that Wong did not communicate effectively and seemed unsure of himself when examining patients, causing them to react with anger or anxiety.

Wong's "Y" grade in Pediatrics triggered another appearance before the SEC and Promotions Board. In a letter to the Promotions Board, Wong attributed his poor performance in the pediatric ward to a flu-like virus that affected him during the first two weeks of the clerkship. He

18. *See* Letter from Dean Lewis to Wong (March 22, 1995), Attach. to Lewis Decl., R17, Ex. C at 72 (sent to Wong during the Pediatrics clerkship and setting out the "schedule for the [three remaining] clerkships you must complete consecutively").

19. *See* Lewis Dep., R24 at 7–8, 26.

20. Lewis Decl., R17 at 6, ¶ 11.

21. Final Grade Sheet, Pediatrics Clerkship, Winter/Spring 1995, Attach. to Lewis Decl., R17, Ex. C at 3.

22. *Id.*

23. *Id.*

24. Letter from William M. Birdsong, M.D., to the SEC (May 9, 1995), Attach. to Lewis Decl., R17, Ex. C at 55.

stated that during this time, he was extremely ill, once requiring IV fluids, and that he fell behind in his reading which affected his performance in the wards. Wong also mentioned being preoccupied with his mother's health; she recently had been diagnosed with cancer. Wong contends that Dean Lewis's refusal to grant him an eight-week reading period prior to this clerkship also contributed to his failing grade; he did not tell the Promotions Board about the refused accommodation because, according to Wong, Dean Lewis ordered him not to mention that issue, an allegation that the University has not disputed.

The SEC recommended dismissal from the School of Medicine, and the Promotions Board concurred. Although the Promotions Board does not keep records of its proceedings, Wong was present during some of the Board's debate and contends that Dean Lewis (a member of both the SEC and Promotions Board) dominated the discussion. The written recommendation of the Promotions Board stated that it had "considered at length the academic record of Mr. Wong, [including] his current academic deficiency, a 'Y' grade in [the] Pediatrics Clerkship.... After a discussion, it was ... approved to recommend Mr. Wong['s dismissal] for failure to meet the academic standards of the School of Medicine." [25] The Dean of the School of Medicine accepted this recommendation and dismissed Wong on May 17, 1995.

Wong did not appeal his dismissal through the procedure for appeal outlined in the School of Medicine Bylaws and Regulations.

## II. DISCUSSION

 To establish a prima facie case of discrimination based upon his disability in violation of the Acts, Wong must produce evidence that: (1) he is "disabled" as the Acts define that term; (2) he is qualified to remain a student at the School of Medicine, meaning that he can meet the essential eligibility requirements of the school with or without reasonable accommodation; [26] (3) he "was dismissed solely because of [his] disability;" and (4) the school "receives federal financial assistance (for the Rehabilitation Act claim) or is a public entity (for the ADA claim)." *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir.1999). For summary judgment purposes, the University concedes that Wong has met the first and last elements of this test. The dispute focuses upon the second element: the University argues that Wong was not qualified because he could not satisfy the academic standards of the School of Medicine, even with reasonable accommodation.

 Wong bears the "initial burden of producing evidence" both that a reasonable accommodation exists and that this accommodation "would enable [him] to meet the educational institution's essential eligibility requirements." *Zukle*, 166 F.3d

**25.** Mem. from Promotions Board Chair to Dean of School of Medicine (May 16, 1995), Attach. to Lewis Decl., R17, Ex. C at 49. The University also has filed the declarations of two psychologists who, following Wong's dismissal, reviewed his entire academic record and expressed the opinion that, given his disability, they doubted whether he ever would be able to acquire the skills necessary to practice clinical medicine. *See* Decl. of Glenn A. Hammel, Ph.D., R19, at 1–2, ¶¶ 2–4; Decl. of James C. Wilson, Ph.D., R20, at 1–2, ¶¶ 2–4.

**26.** Although Title II of the ADA uses the term "reasonable modification" rather than "reasonable accommodation," these terms do not differ in the standards they create. *See* 29

U.S.C. § 794(d) (directing that standards used to determine when violation of Title I of the ADA has occurred also apply to violation of section 794); 42 U.S.C. § 12111(8) (defining "[q]ualified individual with a disability," against whom employer may not discriminate under Title I of the ADA, in terms of "reasonable accommodation");, *see also Zukle*, 166 F.3d at 1045 n. 11 (observing that "Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act [29 U.S.C. § 794], and is to be interpreted consistently with that provision." (quoting *Theriault v. Flynn*, 162 F.3d 46, 48 n. 3 (1st Cir.1998))). We will continue the practice of using these terms interchangeably.

at 1047. Production of such evidence shifts the burden to the University to produce rebuttal evidence that either (1) the suggested accommodation is not reasonable (because it would substantially alter the academic program), or (2) that the student is not qualified (because even with the accommodation, the student could not meet the institution's academic standards). *See id.* Wong argues that, viewing the evidence in his favor, he has created an issue of fact as to whether allowing him eight weeks of additional reading time between the Surgery and Pediatrics clerkships was a reasonable modification of the School of Medicine's academic program. If extra reading time was reasonable, Wong contends, the evidence shows that he was qualified to continue in the School of Medicine because when granted that accommodation, he met the school's standards, performing satisfactorily in both the academic and interactive portions of his courses. According to the University, however, it is entitled to summary judgment because it has rebutted Wong's evidence on both of these points as a matter of law.

A. *Standards of Review*

■ We review the district court's order granting summary judgment *de novo*. *See, e.g., Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). We construe all evidence and reasonable inferences it creates in the light most favorable to the nonmoving party. *See Brookside Assocs. v. Rifkin,* 49 F.3d 490, 492–93 (9th Cir.1995). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *United States ex rel Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). Only if, viewing all of the evidence in this manner, "no genuine issue as to any material fact" exists, is the moving party entitled to summary judgment. Fed.R.Civ.P. 56(c).

■ In this case, we must consider another standard of review as well: the degree of deference (if any) with which we should treat an educational institution's decisions involving its academic standards and curriculum. We recently observed that the Supreme Court, in the context of examining whether a university violated a student's constitutional rights to due process when it dismissed him, has held that judges "should show great respect for [a] faculty's professional judgment" when reviewing "the substance of a genuinely academic decision." *Regents of the Univ. of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985), *quoted in Zukle,* 166 F.3d at 1047. Extending this reasoning to the realm of the ADA and Rehabilitation Act, we concluded, as most other circuits have, "that an educational institution's academic decisions are entitled to deference." *Zukle,* 166 F.3d at 1047 (citing with approval cases from the First, Second, and Fifth Circuits). We typically defer to the judgment of academics because courts generally are "ill-equipped," as compared with experienced educators, to determine whether a student meets a university's "reasonable standards for academic and professional achievement." *Id.* (internal quotations omitted).

■ This deference is not absolute, however: courts still hold the final responsibility for enforcing the Acts, including determining whether an individual is qualified, with or without accommodation, for the program in question. We must ensure that educational institutions are not "disguis[ing] truly discriminatory requirements" as academic decisions; to this end, "[t]he educational institution has a 'real obligation ... to seek suitable means of reasonably accommodating a handicapped person *and to submit a factual record indicating that it conscientiously carried out this statutory obligation.*'" *Zukle,* 166 F.3d at 1048 (quoting *Wynne v. Tufts Univ. Sch. of Med.,* 932 F.2d 19, 25–26 (1st Cir.1991) (en banc) (*Wynne I*)) (emphasis

added). Subsumed within this standard is the institution's duty to make itself aware of the nature of the student's disability; to explore alternatives for accommodating the student; and to exercise professional judgment in deciding whether the modifications under consideration would give the student the opportunity to complete the program without fundamentally or substantially modifying the school's standards. *See Wynne I*, 932 F.2d at 26 (explaining that institution needs to submit *"undisputed facts"* showing that "relevant officials" "considered alternative means, their feasibility, [and] cost and effect on the academic program") (emphasis added); *id.* at 28 (refusing to defer when institution presented no evidence regarding "who took part in the decision" and finding "simple conclusory averment" of head of institution insufficient to support deferential standard of review). We defer to the institution's academic decisions only after we determine that the school "has fulfilled this obligation." *Zukle*, 166 F.3d at 1048. Keeping these standards in mind, we examine the two issues in contention: whether the accommodation Wong requested was reasonable and whether, with accommodation, he was "qualified" to continue his studies at the School of Medicine.

### B. *Reasonable Accommodation*

A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Zukle*, 166 F.3d at 1046 (quoting 28 C.F.R. § 35.130(b)(7)). The Acts do not require an academic institution "to make fundamental or substantial modifications to its programs or standards," however. *Id.; see also Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 413, 99 S.Ct. 2361, 2370–71, 60 L.Ed.2d 980 (1979) (Rehabilitation Act does not require school to substantially modify or lower its standards to accommodate disabled students). Because the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir.1996). As we have observed in the employment context, "mere[ ] speculat[ion] that a suggested accommodation is not feasible" falls short of the "reasonable accommodation" requirement; the Acts create "a duty to 'gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are *necessary* to enable [the individual to meet the standards in question].' " *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir.1993) (quoting *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir. 1985)).

In the typical disability discrimination case in which a plaintiff appeals a district court's entry of summary judgment in favor of the defendant, we undertake this reasonable accommodation analysis ourselves as a matter of course, examining the record and deciding whether the record reveals questions of fact as to whether the requested modification substantially alters the performance standards at issue or whether the accommodation would allow the individual to meet those requirements. In a case involving assessment of the standards of an academic institution, however, we abstain from an indepth, *de novo* analysis of suggested accommodations that the school rejected if the institution demonstrates that it conducted such an inquiry itself and concluded that the accommodations were not feasible or would not be effective. *See supra* Part II.A. We do not defer to the academic institution's decision in the present case because the record that the University presented falls short of this requirement.

Dean Lewis's denial of Wong's requested accommodation is not entitled to deference because the University failed to present us with a record undisputedly showing

that Dean Lewis investigated the proposed accommodation to determine whether the School of Medicine feasibly could implement it (or some alternative modification) without substantially altering the school's standards. First, Dean Lewis rejected Wong's request for an eight-week reading period before the Pediatrics clerkship without informing himself of Wong's need for accommodation of his learning disability. Despite Dr. Steward's earlier statement to Dean Lewis to the effect that Wong was certain to need additional time to finish the third-year clerkships, Dean Lewis failed to discuss Wong's proposal with any of the professionals who had worked with Wong to pinpoint his disability and help him develop skills to cope with it.[27] This omission is particularly noteworthy when considered in light of the following testimony that Dean Lewis gave at his deposition:

> Q: Am I correct, Dr. Lewis, that you are the person within the School of Medicine who has the ultimate authority to determine what accommodations should be made available to students with disabilities?
>
> A: I'm not responsible for determining which accommodations will be offered to students[;] my office is responsible for seeing that the suggested accommodations are provided to the students, but we don't make the decisions as to what the accommodations are.
>
> Q: Who does?
>
> A: The Disability Resources Center.[28]

Given Dean Lewis's own description of the limitations upon his responsibility in assessing appropriate accommodations, the fact that he simply passed messages to Wong through the registrar stating his decision to deny Wong's request-without consulting Wong or any person at the University whose job it was to formulate appropriate accommodations-strikes us as a conspicuous failure to carry out the obligation "conscientiously" to explore possible accommodations.

Second, the evidence creates real doubts that Dean Lewis gave any consideration to the effect the proposed accommodation might have upon the School of Medicine's program requirements or academic standards at the time he denied Wong's request. In his October 1997 deposition, Dean Lewis stated that he denied Wong's requested accommodation because (1) Wong wanted to graduate on time, and (2) Wong already had taken Pediatrics and had received a significant amount of time off for reading, and Dean Lewis therefore did not believe Wong needed additional time off. Neither of these reasons is relevant to the School of Medicine's curriculum or standards. Only in a declaration dated two months after this deposition did Dean Lewis assert that he denied the requested accommodation because it was "contrary to the purposes of the curriculum."[29] A jury reasonably could find that Dean Lewis did not formulate this final rationale for denying the accommodation until long after Wong's dismissal from the School of Medicine. Such after-the-fact justification obviously does not satisfy the University's obligation to present "undisputed facts" showing that it conscientiously considered whether possible modification would fundamentally or substantially alter the school's standards when it decided that it could not reasonably accommodate the disabled student. *See Wynne I*, 932 F.2d at 26.[30] We therefore do not

---

27. Dr. Steward had left the faculty of the School of Medicine in 1994. Wong received his initial diagnosis at the University's DRC, however, and several different professionals had evaluated him, both at the DRC and as a result of Dr. Steward's independent referrals.

28. Dep. of Dr. Ernest Lewis, R24 at 3.

29. Lewis Decl., R17 at 6, ¶ 11.

30. In *Zukle*, we cited *Wynne I* with approval for the proposition that the academic institution must present a factual record that it conscientiously fulfilled its obligation to seek suitable means of accommodating disabled students. *See Zukle*, 166 F.3d at 1048. We

defer to the institution's decision; we examine the rejection of Wong's request for an eight-week reading period *de novo*.

We briefly note that both parties have met their burdens of production as to whether the accommodation was reasonable. Among other things, Wong has shown that the University granted this accommodation in the past. The University, on the other hand, has produced the testimony of Dean Lewis that the eight-week break Wong requested was unreasonable because it required the School of Medicine to alter its curriculum. It contends that the schedule was designed for students to complete consecutively to allow them to practice skills consistently and frequently and to allow the faculty to evaluate the steady development of those skills.[31] Allowing extra time for reading before every clerkship does not comport with this goal, the University argues. Our analysis focuses upon whether this evidence shows as a matter of law that the proposed accommodation is unreasonable; we conclude for the reasons discussed below that the evidence creates an issue of fact as to the reasonableness of granting Wong an eight-week reading period prior to his Pediatrics clerkship.

First, Dr. Steward, the Coordinator of the Student Learning Disability Resource Teams and a member of the medical school faculty, informed Dean Lewis soon after Wong's diagnosis that Wong certainly would need additional time to complete the clerkship portion of the curriculum. Dr. Steward also stated that if Wong passed the Medicine clerkship after receiving additional reading time, that success would provide empirical support for Wong to re-ceive the same accommodation for his next clerkship. A jury could have found Dr. Steward a persuasive authority on the issue whether the decelerated schedule fundamentally altered the curriculum. *See also* 34 C.F.R. § 104.44(a) (regulation interpreting Rehabilitation Act as it applies to postsecondary education stating that "[m]odifications may include changes in the length of time permitted for the completion of degree requirements" (emphasis added)).

Second, the School of Medicine had granted Wong this same accommodation for his two previous clerkships. An institution's past decision to make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future, nor does it render the accommodation reasonable as a matter of law. *See, e.g., Myers v. Hose,* 50 F.3d 278, 284 (4th Cir.1995) (holding that fact that employer had offered accommodation to employees in the past did not require employer to grant same accommodation to plaintiff as a matter of federal law). The fact that the school previously made the exact modification for the Surgery and Medicine clerkships that Wong requested for the Pediatrics clerkship, however, is certainly persuasive evidence from which a jury could conclude that the accommodation was reasonable. *Cf. Hunt–Golliday v. Metropolitan Water Reclamation Dist.,* 104 F.3d 1004, 1013 (7th Cir.1997) (observing fact that employer previously had restricted employee's lifting requirements to 50 pounds in response to back injury indicated that this accommodation was reasonable).[32] The

did not delve into the particulars of what that record must show to entitle the school to deference, however, because that case did not call for any analysis of this issue: *Zukle* presented no dispute about whether the school properly had considered its ability feasibly to accommodate that disabled student.

**31.** *See* Lewis Decl., R17 at 5, ¶ 11.

**32.** In *Zukle,* we specifically considered the school's previous decisions to grant students'

requests for decelerated schedule as probative of the issue whether that plaintiff's request for eight weeks off between clerkships was reasonable. *See* 166 F.3d at 1050. In that case we determined that the defendant was entitled to summary judgment because the plaintiff had not produced evidence from which a jury could conclude that the accommodation was reasonable given her particular circumstances. Here, in contrast, Wong has produced such evidence. *See id.* at 1048

School of Medicine also deviated from the consecutive clerkship standard when it allowed Wong to take a leave of absence during the third year to spend time with his ailing father. Both of these occurrences imply that consecutive completion of the third-year clerkships was not an essential element of the curriculum.

Third, that Wong had earned "B's" and received generally positive comments in the Medicine and Surgery clerkships for which Dean Lewis granted him eight weeks of reading time indicates that it may have been reasonable for Wong to continue receiving this same accommodation. *Cf. Roberts v. Progressive Indep., Inc.,* 183 F.3d 1215, 1220 (10th Cir.1999) (in the employment context, holding that "[r]easonable accommodation[s are] those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job") (internal quotations and citations omitted). From this evidence, a jury could conclude that the decelerated schedule allowed Wong to meet the substantive academic standards of the two clerkships for which he received the eight-week reading period. Allowing disabled individuals to fulfill the "essential eligibility requirements for … participation in programs" is, after all, the principle behind the statutory mandate that public entities provide disabled individuals with reasonable accommodations. 42 U.S.C. § 12131(2).

Our holding that Wong has created an issue of fact as to the reasonableness of an eight-week reading period between clerkships does not conflict with our opinion in *Zukle,* in which we decided that the plaintiff did not create an issue of fact as to the reasonableness of the same accommodation that Wong requested. *See* 166 F.3d at 1050–51. In *Zukle,* we reached the conclusion that a disabled medical student's requested decelerated schedule for clerkships was not a reasonable accommo-

("[W]hat is reasonable in a particular situation may not be reasonable in a different situation-even if the situational differences are relatively slight.").

dation only after determining that a deferential standard of review was appropriate. We noted that the Promotions Board had considered the plaintiff's previous failure to perform adequately even when granted a decelerated schedule. *See id.* at 1050–51. Given that plaintiff's inability to perform even *with* accommodation, we concluded that the school made a rationally considered decision that allowing her to remain in the program would negatively impact the school's academic standards. Here, however, Wong has presented evidence that when granted the decelerated schedule, his performance drastically improved, and that the University failed to consider fully the effect of this modification on its program and on his abilities. *See id.* at 1048 ("[R]easonableness is not a constant. To the contrary, what is reasonable in a particular situation may not be reasonable in a different situation-even if the situational differences are relatively slight.") (internal punctuation and citation omitted).

We re-emphasize that at this stage of the litigation, we examine all of the record evidence in the light most favorable to Wong. We do not hold that allowing Wong to take eight weeks off between each of the third-year clerkships would have been a reasonable accommodation; in fact, we recognize that a jury may well find that, despite the evidence we have just discussed, this modification to the school's curriculum was not reasonable. Under the summary judgment standard, however, we do not consider whether a jury could find in favor of the defendant: we affirm the entry of summary judgment only if a jury could not find for the plaintiff. Here, a jury could decide that the modification he requested in the School of Medicine's program was reasonable. The district court erred in concluding otherwise.[33]

33. In its order granting the University's motion for summary judgment, the district court stated that it would disregard the parties' discussion of "time off" as an "accommoda-

### C. Qualified Individual

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity...." 42 U.S.C. § 12132. The statute defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the ... participation in programs or activities provides by a public entity." *Id.* § 12131(2). The Rehabilitation Act creates similar rights and duties.[34] In the context of postsecondary education, administrative regulations define "qualified" as

"meet[ing] the academic and technical standards requisite to ... participation in the ... education program or activity." 34 C.F.R. § 104.3(k)(3). For purposes of resolving the summary judgment issue, Wong concedes that he is not qualified to continue in the School of Medicine without reasonable accommodation; the issue we must consider, therefore, is whether, with the accommodation of time off between clerkships for additional reading, Wong has created an issue of fact that he could satisfy the school's academic standards.

 Again, our analysis begins with a determination of whether we defer to the University's decision to dismiss Wong for "failure to meet the academic standards of the School of Medicine."[35] We will not

---

tion," essentially concluding as a matter of law that additional time "dilute[d] appropriate academic standards" and thus fell outside of the Acts' requirements. District Ct. Order, R37 at 12 n. 5; *see also id.* at 13 & n. 6 (accepting as a matter of law the University's argument that granting additional time between clerkships for reading fundamentally altered the academic program and *sua sponte* applying this reasoning to the reading periods the school granted Wong for the Surgery and Medicine clerkships, stating: "Why this was considered an appropriate accommodation by the university, even at the outset, is puzzling to this court."). The district court misguidedly incorporated into its decision its own perception that the time Wong requested (and the University originally granted) significantly modified the curriculum.

We have determined in this case that we could not treat the University's denial of the requested accommodation with deference because it did not demonstrate that it conscientiously exercised professional judgment in considering the feasibility of the modification in making that decision. Even so, where record evidence indicates that an institution determined that certain modifications to its program were acceptable, courts may not as a matter of law disregard that evidence in favor of their own ideas about what constitutes "appropriate academic standards."

In addition to relying upon its own assessment of the importance of different functions of an academic curriculum, the district court also based its conclusion in part upon the University's stated goal of requiring students to apply their knowledge "within the time demanded by the live clinical setting." District Ct. Order, R37 at 13 n. 6. The University

does contend that this ability is an important part of its curriculum, but it did not defend the "consecutive clerkship" requirement on this basis: it claimed that it intended the clerkships to proceed in succession to allow students to practice their skills frequently and consistently and to allow the faculty to assess students' progress more effectively. *See* Lewis Decl., R17 at 5, ¶ 11. Although the former goal may indeed be an important part of the University's curriculum, the district court erred in holding that this function of the program rendered the accommodation unreasonable *per se* because the University did not contend that the "consecutive clerkship" requirement advanced the "live clinical setting" goal.

**34.** The Rehabilitation Act prohibits discrimination against an *"otherwise* qualified individual with a disability."* 29 U.S.C. § 794(a) (emphasis added). Courts repeatedly have noted that despite this slight difference in terminology, the same analysis applies to claims under both Acts. *See, e.g., Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 150 n. 7 (2d Cir.1999) (comparing this particular language in ADA and Rehabilitation Act); *Nelson v. Miller,* 170 F.3d 641, 649 (6th Cir.1999) (noting that analysis under these two provisions is essentially the same); *see generally Zukle,* 166 F.3d at 1045 n. 11 (collecting cases noting relationship between the ADA and Rehabilitation Act).

**35.** Mem. from Promotions Board Chair to Dean of School of Medicine (May 16, 1995), Attach. to Lewis Decl., R17, Ex. C at 49.

defer to a school's decision if the ostensibly professional, academic judgment "disguise[s] truly discriminatory requirements." *Zukle*, 166 F.3d at 1048. Moreover, the academic institution bears the burden of presenting us with a factual record that shows it conscientiously considered all pertinent and appropriate information in making its decision. Far from demonstrating a conscientious effort to consider all relevant factors in deciding that Wong could not meet the school's academic requirements even with reasonable accommodation, the record contains evidence that the University eschewed its obligation to consider possible modifications it could make (or could have made) in the program to accommodate Wong and the past and potential effects of such accommodations (and lack thereof) on Wong's performance.

The University has not disputed Wong's assertion that Dean Lewis instructed him not to mention the requested accommodation-or Dean Lewis's denial of it-to the Promotions Board. In fact, the record contains evidence that at least two Promotions Board members believed that Dean Lewis *had* given Wong accommodations and erroneously believed that Wong had been unable to perform adequately even with those modifications.[36] These same two individuals also identified Wong's failure of the Pediatrics clerkship as the determining factor in their decision to dismiss him.[37] Finally, Dean Lazarus, who issued the letter formally dismissing Wong, testified that Dean Lewis told him that Wong had been accommodated and that based upon this representation and the Promotions Board's recommendation for dismissal, he issued the school's decision without considering the matter independently.[38] The University has presented no evidence that the Promotions Board considered the fact that in his previous two clerkships, Wong had performed well after receiving an eight-week reading period as an accommodation but that in the Pediatrics clerkship, Wong performed poorly after failing to receive the same accommodation. *Cf. Zukle*, 166 F.3d at 1050–51 (in deferring to University's decision not to grant accommodation to that plaintiff, noting that Promotions Board had considered fact that the student previously had "experienced severe academic difficulties" "even on a decelerated schedule").

This failure to take Wong's disability and need for accommodation into account shows that the school's system for evaluating a learning disabled student's abilities and its own duty to make its program accessible to such individuals fell short of the standards we require to grant deference to an academic institution's decision-making process. We therefore analyze whether Wong has created an issue of fact with respect to his qualifications *de novo.*

■■■ Wong has produced enough evidence that he could meet the University's

---

**36.** For example, the following dialogue occurred during the deposition of the Chair of the Promotions Board:

> Q: If he was given more support, he would have performed well in pediatrics as well?
>
> A: Well, I will reflect the opinion of the Committee at this moment is that that support and opportunity had been given, and still there was unsatisfactory performance, and on that basis, and the fact that he was on probation at that time, that the Board voted to recommend dismissal.

Dep. of Dr. George Jordan, R25 at 17. In fact, Wong received extra time on some of his exams, including Pediatrics, but did not receive any additional time to read in preparation for Pediatrics. *See also* Dep. of Pro-

motions Board member Dr. Donal Walsh, R26 at 14–15 (stating, in response to question regarding whether the Promotions Board discussed Wong's learning disability, "I believe it was discussed generally. I don't believe it was discussed in detail.").

**37.** *See* Jordan Dep., R25 at 4 (stating that the Promotions Board voted to dismiss Wong because "[h]e received [sic] insufficient grade in the pediatrics clerkship at the time that he was on probation."); Walsh Dep., R26 at 13.

**38.** *See* Dep. of School of Medicine Dean Gerald Lazarus, Attach. to Pl.'s Mem. of Points and Authorities in Opp'n to Mot. for Summ. J., R32, Ex. F at 63.

eligibility requirements to shift the burden of production to the University: his final grade sheets from the Medicine and Surgery clerkships for which he received the accommodation show that he received satisfactory grades and generally positive comments from his evaluators. The University argues, however, that an examination of Wong's entire academic record demonstrates that he did not have the capacity to become an effective physician. Evaluators from multiple courses reported flaws in his performance-such as Wong's inability to comprehend verbal information, accurately respond to questions posed to him on the wards, think on his feet, and relate to patients and staff-that the University argues could not be corrected simply by allowing Wong additional time to read before each clerkship. Thus, the University contends, Wong was not qualified because even with the accommodation he requested, he could not satisfy the School of Medicine's standards. We acknowledge that Wong's performance in some areas of the clerkship program were less than ideal, and a jury may eventually determine that Wong simply does not have and cannot acquire-even with reasonable modifications to the program-skills that are indispensable for the receipt of a license to practice medicine. For the reasons discussed below, however, we cannot say as a matter of law that he was unqualified to continue participating in the medical program.

Most importantly, a comparison of Wong's final grade sheets from his 1991 Surgery and 1993 Medicine clerkships (which he failed and for which he received no accommodation) and his 1994 Medicine and 1995 Surgery clerkships (which he passed with grades of "B" and for which he received eight weeks of reading time

prior to starting) show a marked improvement, not only in Wong's performance on written and oral examinations, *but also in his performance in the clinical setting.* For example, the final grade sheet for the 1993 Medicine clerkship reported that Wong's clinical performance was "below that expected" because, for example, he could not collect data from patients and use it to formulate a diagnosis; his oral presentations were problematic; and he had difficulty with interpersonal interactions.[39] In contrast, his 1994 Medicine clerkship evaluation stated that his clinical performance was "satisfactory in all areas."[40] It noted some difficulty with verbal presentations, including taking a little extra time or repeating a question, but stated that he nonetheless answered questions satisfactorily. Significantly, this grade sheet reported excellent performance in two areas with which Wong earlier had struggled: interpersonal relationships (both with patients and with other professionals) and synthesizing a diagnosis while taking a patient's history.[41]

■ Wong's poor performance in the 1995 Pediatrics clerkship for which he did not receive the accommodation he requested mimicked his earlier failures. The comments he received regarding his clinical performance were similar to the assessments of his work in the 1993 Medicine and 1991 Surgery clerkships: he could not synthesize information; his oral presentation skills were poor; and he lacked confidence.[42] From all of this evidence, a reasonable jury could discern a pattern: Wong failed when he did not have extra time to prepare before a clerkship, but with the modified schedule, he succeeded in all areas of the clerkship.

The University points out that Wong's scores on the written and oral examina-

---

39. Final Grade Sheet, Medicine Clerkship, Summer 1993, Attach. to Lewis Decl., R17, Ex. C at 9.

40. Final Grade Sheet, Medicine Clerkship, Summer/Fall 1994, Attach. to Lewis Decl., R17, Ex. C at 8.

41. *See id.*

42. *See* Final Grade Sheet, Pediatrics Clerkship, Winter/Spring 1995, Attach. to Lewis Decl., R17, Ex. C at 3.

tions in the 1995 Pediatrics clerkship were good; only his clinical and ward performance was less than satisfactory. Based upon these facts, the University contends that Wong still was not qualified because the accommodation he requested, additional reading time, would not have improved the "hands-on" skills with which he had so much difficulty. In addition to Wong's performance in the 1994 Medicine and 1995 Surgery clerkships, which tend to disprove the University's assertion, evidence from one of the School of Medicine's own faculty members discounts this argument. In a memorandum to Dean Lewis written soon after Wong received his learning disability diagnosis, Dr. Steward reported that two of the professionals who helped diagnose Wong concurred in Wong's own perception that his problems with processing verbal information increased "when he is anxious, worried, and/or nervous, and *when the vocabulary includes new, technical information.*" [43] Similarly, "negative and anxious emotions can interrupt or exacerbate [Wong's difficulty expressing himself verbally], and new or not-quite-mastered terms and concepts are more likely to be difficult to retrieve than older material." [44] From this analysis of Wong's disability, a reasonable jury could conclude that having reading time between clerkships allowed him to perform satisfactorily by (1) enabling him to familiarize himself with new, technical information so that he could communicate more easily on these topics and (2) easing his anxiety about the new information, thus making him more comfortable in the clinical setting.

The University emphasizes that Wong passed the Pediatrics clerkship the first time he took it, in 1992, without any ac-

commodation. Although this fact does bolster the school's argument that the lack of extra reading time should not have affected Wong's performance in Pediatrics in 1995, the fact that Pediatrics had become "a lot more rigorous in the last five [or] six years" [45] mitigates the support this evidence lends to the University's position. Finally, we give little credence to the University's argument that the total amount of time Wong already had spent in the third year of medical school-nearing four years at the time of his dismissal-indicates that he simply could not master the skills that the school's curriculum demanded. The majority of this time was attributable to the death of Wong's father; courses Wong failed prior to his diagnosis; and courses that Wong had passed but that the school required him to retake. If a jury were to find that the schedule modification Wong requested was reasonable, we could attribute at the most one year of additional time in the third year curriculum to the accommodation of his disability.[46] Neither the University's argument regarding Wong's prior passing grade in Pediatrics nor the emphasis it places upon the amount of time he had spent in the third year is sufficient to overcome, as a matter of law, the evidence Wong presented that when given extra time to read between clerkships, he could meet the academic standards of the School of Medicine.

## III. CONCLUSION

Faculty members and administrators of a professional school are unquestionably in the best position to set standards for the institution and to establish curricular requirements that fulfill the school's purpose of training students for the work that lies

43. Mem. to Dean Lewis from Dr. Steward (April 14, 1994), Attach. to Lewis Decl., R17, Ex. C at 88 (emphasis added).

44. *Id.* at 88–89.

45. Lewis Dep., R24 at 26.

46. If, starting on a clean slate, Wong received eight weeks off before every clerkship in the

third-year curriculum, it would take him two years instead of one to complete these courses. Incidentally, we note that at least one member of the Promotions Board focused heavily on the time factor in voting to dismiss Wong. *See* Walsh Dep., R26 at 14, 15–17, 25, 29.

ahead of them. However, "extending deference to educational institutions must not impede our obligation to enforce the ADA and the Rehabilitation Act.... The educational institution has a 'real obligation ... to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation.'" *Zukle*, 166 F.3d at 1048 (quoting *Wynne I*, 932 F.2d at 25–26). Here, school administrators accepted the recommendation of a faculty member (and learning disability services coordinator) to grant Wong the schedule modification he requested for two courses, and Wong performed well with this accommodation. The School of Medicine did not present any evidence that during this time period, it believed that Wong's decelerated schedule impeded his attainment of the goals of the program or lowered the school's academic standards. Then, however, for reasons about which there is a dispute of fact, the school refused to continue granting Wong the accommodation and dismissed him when he could not perform satisfactorily without it.

The deference to which academic institutions are entitled when it comes to the ADA is a double-edged sword. It allows them a significant amount of leeway in making decisions about their curricular requirements and their ability to structure their programs to accommodate disabled students. On the other hand, it places on an institution the weighty responsibility of carefully considering each disabled student's particular limitations and analyzing whether and how it might accommodate that student in a way that would allow the student to complete the school's program without lowering academic standards or otherwise unduly burdening the institution. Here, although the record shows that the University failed to undertake this task properly, the University still asks that we hold as a matter of law and at a very early stage of this litigation that it has

satisfied its legal obligations under the ADA. Under the circumstances, we cannot grant this request. We will not sanction an academic institution's decision to refuse to accommodate a disabled student and subsequent dismissal of that student when the record contains facts from which a reasonable jury could conclude that the school made those decisions for arbitrary reasons unrelated to its academic standards.

Because genuine issues of fact remain as to both the reasonableness of the accommodation in question and Wong's qualifications, summary judgment was inappropriate. Resolving these factual disputes is the province of a jury. We REVERSE the order of the district court and REMAND this case for further proceedings consistent with this opinion.