WATERMAN, Justice
(dissenting).
I respectfully dissent. The majority elevates political correctness over common sense. Obscured in its lengthy decision is the fact our court and the Davenport Civil Rights Commission are requiring Palmer College of Chiropractic to permit a student, blind since birth, to interpret X-rays based on what an untrained reader tells him the X-ray films depict and treat patients through vigorous spinal adjustments relying on that interpretation. Aaron Cannon failed to prove such an accommodation is reasonable. As the district court recognized, “vision is indispensable for several critical functions that chiropractic students and professionals must perform, such as reviewing X-rays, analyzing radio-graphs, and assessing physical symptoms.” I defer to no one in my admiration for Cannon and his blind attorney and the challenges they both have overcome, but there is a point at which an accommoda *347 tion ceases to be reasonable, and it has been met here.
What is next? Are we going to require the Federal Aviation Administration to hire blind air traffic controllers, relying on assistants to tell them what is appearing on the screen? The principle is the same here. A misinterpreted X-ray could lead to improper treatment and lifelong paralysis. X-ray interpretation requires training and skilled judgment to reach correct conclusions based on shades and shadows of complex bony structures. That is why many physicians with twenty-twenty vision choose to outsource interpretation of X-rays to radiologists. It is ludicrous to override Palmer’s academic decision and require it to permit a blind person to interpret X-rays for patient treatment based on what someone else claims he or she is seeing.
The majority’s intrusion into academic judgment on professional healthcare standards is unprecedented. No other court in the country has forced an academic institution to allow a blind student to interpret X-rays relying on an untrained sighted assistant. The majority fails to confront the well-reasoned decision of the Ohio Supreme Court applying the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701-797b, to uphold a medical school’s decision to deny admission to a blind student who, like Cannon, requested a personal assistant to read X-rays and help with clinical examinations. Ohio Civil Rights Comm’n v. Case W. Reserve Univ., 76 Ohio St.3d 168, 666 N.E.2d 1376, 1383, 1386 (1996). The district court correctly followed Case Western in concluding such an accommodation was unreasonable and would fundamentally alter Palmer’s program. I would affirm. Our court and the local commission comprised of laypersons have no business second-guessing the professional academic judgment of our nation’s leading college of chiropractic. Palmer has reasonably concluded that its graduates personally must be able to see and interpret X-rays. A student who has never seen a spine cannot reliably interpret spinal X-rays based on what someone else tells him the films show.
I would follow the Ohio Supreme Court’s reasoning in Case Western, the facts of which are strikingly similar to this case. A blind student, Cheryl Fischer, applied to medical school at Case Western Reserve University. Id. at 1379. To evaluate applicants, Case Western applied technical standards promulgated by the Association of American Medical Colleges (AAMC), which required that candidates must be able to “observe a patient accurately at a distance and close at hand.” Id. at 1379-80. The AAMC technical standards explained, “The use of a trained intermediary means that a candidate’s judgment must be mediated by someone else’s power of selection and observation.” Id. at 1380. Case Western “concluded that a blind student would be unable to complete the requirements of the medical school program.” Id. An associate professor of surgery at Case Western emphasized that “Fischer would be unable to exercise independent judgment when reading an X-ray, unable to start an I.V., and unable to effectively participate in the surgery clerkship.” Id. (noting further that Fischer would be unable to “identify tissue and organ structures through a microscope” or “observe how such structures are affected by disease”). “In the[ ] medical educators’ opinions, the use of an intermediary would interfere with the student’s exercise of independent judgment — a crucial part of developing diagnostic skills.” Id. at 1387.
The Ohio Supreme Court deferred to Case Western’s academic judgment, as we *348 should defer to Palmer’s. The Ohio Supreme Court emphasized that an educational institution is in the best position to determine whether a student will be able to successfully complete the program:
[Case Western’s decision not to modify its program by waiving course requirements or permitting intermediaries to read X-rays or perform physical examinations is an academic decision. Courts are particularly ill-equipped to evaluate academic requirements of educational institutions. As a result, considerable judicial deference must be paid to academic decisions made by the institution itself unless it is shown that the standards serve no purpose other than to deny an education to the handicapped.
Id. at 1386 (citations omitted). Deferring to the AAMC technical standards and the medical educators’ opinions, the court acknowledged that waiving the requirement to read an X-ray — or using an intermediary to perform that function — would fundamentally alter the nature of Case Western’s program. Id. at 1387; see also Cunningham v. Univ. of N.M. Bd. of Regents, 531 Fed.Appx. 909, 919-20 (10th Cir.2013) (affirming dismissal of vision-related disability claims by medical student, noting “[t]o the extent [the plaintiff] avers UNM should have changed its program requirements, such an accommodation would not be reasonable”). The Case Western court further recognized that providing a blind student additional supervision and waiving courses for the student is not required under the United States Supreme Court’s decision in Southeastern Community College v. Davis, 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980, 990 (1979), when such accommodations would not change the fact that the student will be unable to satisfy the degree requirements. Case W. Reserve Univ., 666 N.E.2d at 1386-87.
Our case is also analogous to Davis. In Davis, the United States Supreme Court upheld a nursing college’s decision to deny admission to an applicant with a hearing disability, holding the law “does not encompass the kind of curricular changes that would be necessary to accommodate [the applicant] in the nursing program.” Davis, 442 U.S. at 409, 99 S.Ct. at 2369, 60 L.Ed.2d at 990. Similarly to the nursing applicant, Cannon “would not receive even a rough equivalent of the training” Palmer normally gives. Id. at 410, 99 S.Ct. at 2369, 60 L.Ed.2d at 990. “Such a fundamental alteration in the nature of a program is far more than the ‘modification’ the regulation requires.” Id. Like the proposed accommodations for the deaf applicant in Davis, it appears unlikely “Cannon could benefit from any affirmative action that the regulation reasonably could be interpreted as requiring.” Id. at 409, 99 S.Ct. at 2368, 60 L.Ed.2d at 990. Therefore, Palmer, “with prudence,” could not allow Cannon to graduate from the program. Id. at 409, 99 S.Ct. at 2369, 60 L.Ed.2d at 990.
As the majority notes, many practicing chiropractors lack X-ray equipment and rely on other professional radiologists or chiropractors to interpret their patients’ X-rays. Cannon, however, is not asking for a waiver to allow him to rely on the interpretation of a qualified expert. Rather, his requested accommodation is to interpret X-rays himself, based on what an untrained sighted assistant tells him. In any event, the law does not obligate Palmer to waive program requirements. The plaintiff in Case Western argued the school should waive certain medical-school skill requirements because she planned to pursue a practice in psychiatry, in which those skills were unnecessary. 666 N.E.2d at 1386. The Ohio Supreme Court rejected this argument, stating:
*349 The goal of medical schools is not to produce specialized degrees but rather general degrees in medicine which signify that the holder is a physician prepared for further training in any area of medicine. As such, graduates must have the knowledge and skills to function in a broad variety of clinical situations and to render a wide spectrum of patient care. All students, regardless of whether they intend to practice in psychiatry or radiology, are required to complete a variety of course requirements, including rotations in pediatrics, gynecology, and surgery.
Id. at 1387. In the same way, it is Palmer’s prerogative to decide the skills necessary to graduate with a chiropractic degree. A student’s choice to focus his or her practice on certain skills to the exclusion of others does not exempt that student from successfully completing degree requirements.
The majority recognizes that it is appropriate to give deference to an institution’s professional or academic judgment, yet refuses to defer to Palmer because the commission concluded Palmer did not seek out “suitable means of reasonably accommodating” individuals with disabilities. I disagree that Palmer’s investigation fell short. Palmer met with Cannon multiple times, met Iowa Department of the Blind representatives, and expressed a willingness to continue the dialogue. Nothing in the record supports a conclusion that further investigation by Palmer would have found a way for Cannon to personally see and interpret X-rays. Technological advancements may one day allow blind individuals to interpret X-rays. No such “app” exists today. Cannon simply has not satisfied his burden to prove a reasonable accommodation is possible regarding X-ray interpretation. See Boelman v. Manson State Bank, 522 N.W.2d 73, 80 (Iowa 1994) (“[T]he plaintiff must produce enough evidence to make a facial showing that reasonable accommodation is possible.”). The majority would require Palmer to jump through additional hoops to establish what the record already makes clear — Cannon cannot satisfy the chiropractic program requirement that students master X-ray interpretation.
We should defer to Palmer’s conclusion that accommodating Cannon would fundamentally alter its chiropractic program. In North v. State, we recognized “ ‘[c]on-siderations of profound importance counsel restrained judicial review of the substance of academic decisions.’” 400 N.W.2d 566, 571 (Iowa 1987) (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523, 532 (1985)). Though North did not involve a claim under the ADA, the principle of deference expressed in that opinion is a truism with broad application. When presented with ADA claims, courts “have overwhelmingly extended some level of deference to schools’ professional judgments regarding students’ qualifications when addressing disability discrimination claims.” Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 463 (4th Cir.2012) (collecting cases and noting, “[bjecause we are ... at a comparative disadvantage in determining whether Halpern is qualified to continue in the Doctor of Medicine program and whether his proposed accommodations would effect substantial modifications to the Medical School’s program, we accord great respect to Wake Forest’s professional judgments on these issues”). I would follow the United States Supreme Court’s guidance: ‘When judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty’s professional judgment.” Ewing, 474 U.S. at 225, 106 S.Ct. at 513, 88 L.Ed.2d at 532.
*350 The majority relies on Wong v. Regents of University of California, 192 F.3d 807 (9th Cir.1999), and Wynne v. Tufts University School of Medicine (Wynne I), 932 F.2d 19 (1st Cir.1991), but the standards elucidated in those cases favor Palmer. The Court of Appeals for the Ninth Circuit recognized in Wong that:
Faculty members and administrators of a professional school are unquestionably in the best position to set standards for the institution and to establish curricular requirements that fulfill the school’s purpose of training students for the work that lies ahead of them.
192 F.3d at 825-26. The court noted deference to an academic institution is inappropriate only if the institution has not “carefully considered] each disabled student’s particular limitations and analyz[ed] whether and how it might accommodate that student in a way that would allow the student to complete the school’s program without lowering academic standards.” Id. at 826. The court declined to defer to the University of California’s decision to dismiss a student because “the record con-tainted] facts from which a reasonable jury could conclude that the school made th[at] decision[ ] for arbitrary reasons unrelated to its academic standards.” Id. In contrast, the record shows Palmer carefully considered whether it could accommodate Cannon’s disability with a sighted assistant to look at X-rays. Palmer ultimately and reasonably concluded it could not. No reasonable fact finder could conclude Palmer’s decision was unrelated to academic standards.
In Wynne I, the Court of Appeals for the First Circuit set forth the appropriate analysis “to assess whether an academic institution adequately has explored the availability of reasonable accommodations for a handicapped individual.” 932 F.2d at 26.
If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation.
Id. (noting “[i]n most cases, we believe that, as in the qualified immunity context, the issue of whether the facts alleged by a university support its claim that it has met its duty of reasonable accommodation will be a ‘purely legal one’ ” (quoting Mitchell v. Forsyth, 472 U.S. 511, 528 n. 9, 105 S.Ct. 2806, 2816 n. 9, 86 L.Ed.2d 411, 426 n. 9 (1985))). The student in Wynne I asked Tufts University School of Medicine to accommodate his disability by using a different testing method than multiple choice to evaluate his progress. Id. at 22. The court concluded the evidence was insufficient to grant summary judgment in favor of Tufts because the record did not demonstrate the school considered possible alternatives or discussed the unique qualities of multiple choice examinations. Id. at 28. The court therefore remanded the case for further fact-finding. Id.
Following remand, Tufts provided additional evidence explaining why “ ‘the multiple choice format provides the fairest way to test the students’ mastery of the subject matter of biochemistry.’ ” Wynne v. Tufts Univ. Sch. of Med. (Wynne II), 976 F.2d 791, 794 (1st Cir.1992). With the additional evidence, the district court concluded Tufts met the standard elucidated in Wynne I and entered summary judgment in favor of Tufts. Wynne II, 976 F.2d at 793. The student again appealed to the *351 First Circuit. See id. The Wynne II court acknowledged that “Tufts’ explanations, though plausible, are not necessarily ironclad.” Id. at 795. But, the court emphasized “the point is not whether a medical school is ‘right’ or ‘wrong’ in making program-related decisions.” Id. Rather, “[t]he point is that Tufts, after undertaking a diligent assessment of the available options,” decided “no further accommodation could be made without imposing an undue (and injurious) hardship on the academic program.” Id. The First Circuit therefore affirmed summary judgment for Tufts, stating “the undisputed facts contained in the expanded record, when considered in the deferential light that academic decisionmaking deserves, meet the required standard.” Id. at 796 (emphasis added) (citation omitted). Likewise, Palmer has provided compelling explanations why accommodating Cannon’s disability with a sighted assistant to look at X-rays for him would fundamentally alter the chiropractic program. We owe deference to Palmer’s explanations.
In order to accommodate Cannon, Palmer would have had to lower its academic standards — something the law does not require. See Wong, 192 F.3d at 826 (noting an institution is responsible for “carefully considering each disabled student’s particular limitations and analyzing whether and how it might accommodate that student in a way that would allow the student to complete the school’s program without lowering academic standards ” (emphasis added)); Wynne II, 976 F.2d at 795 (deferring to Tufts’ conclusion that accommodating the student “would require substantial program alterations, result in lowering academic standards, and devalue Tufts’ end product — highly trained physicians carrying the prized credential of a Tufts degree”). As a professor explained, the Palmer radiology curriculum has three primary goals: to teach students to (1) produce diagnostic-quality X-rays, (2) interpret and glean clinical information off of X-ray film, and (3) apply the information in a clinical sense for case management. The district court summarized how Cannon’s proposed accommodation — a sighted assistant to describe X-rays to him — would work: “Cannon asks a series of questions to the assistant, gradually posing those questions more and more specifically as needed in order to obtain the information necessary for him to visualize the displayed image or text.” A professor explained why this accommodation would compromise Palmer’s academic requirements:
I haven’t been able to determine how a sighted assistant could give information to the blind student that would not compromise [the student’s] independent judgment of those films. [For the student to ask] the question, is the film too dark or is the film too light, immediately [the reader’s] answer to that is a judgment and it compromises the student’s ability to independently make that judgment themselves.
[[Image here]]
And so if a student is told ... the film is too dark, somebody has already made the judgment for them.... If they are told the patient is not aligned or they ask the question is the patient aligned and the answer is no, then that, once again, leverages their independent judgment as to whether or not the film needs to be repeated and/or what needs to be done to make the film better.
Essentially, a sighted assistant would have to interpret the X-rays and then relay that interpretation to Cannon; Cannon would not be interpreting the X-rays himself. In light of these realities, Palmer determined that Cannon would be unable to attain the goals of the radiology curriculum. Palmer *352 has demonstrated that a sighted assistant is not a reasonable accommodation.
It is not as if Palmer adopted the technical standards lightly or did not consider Cannon’s arguments for why he should be admitted. Palmer has carefully considered the skills necessary to become a chiropractor and determined that the ability to read X-rays is integral. As one Palmer professor explained, the technical standards Palmer adopted are “clearly based from an educational perspective on individuals that we have interacted with in the curriculum and what has worked and what has not worked.” Palmer adopted its technical standards in order to comply with the Council on Chiropractic Education’s national accreditation standards, further supporting the school's conclusion that vision is necessary to earn a chiropractic degree. See Case W. Reserve Univ., 666 N.E.2d at 1379-80, 1385-86 (deferring to Case Western’s application of technical standards promulgated by the AAMC). As noted, Palmer met with Cannon multiple times, met with Iowa Department of the Blind representatives, and expressed a willingness to continue the dialogue. Cf. Wong, 192 F.3d at 819, 821 (reversing summary judgment in favor of university when “Dean Lewis failed to discuss Wong’s proposal with any of the professionals who had worked with Wong to pinpoint his disability and help him develop skills to cope with it.”). Yet, Palmer remained convinced that the program modifications necessary to accommodate Cannon would fundamentally alter its program.
I do not find it legally significant that Palmer modifies its course requirements and grants certain waivers for blind students enrolled at its California campus. California law mandates these accommodations by statute. See Cal. Bus. & Prof. Code § 1000-8 (West, Westlaw through ch. 25 of 2014 Reg. Sess., Res. ch. 1 of 2013-2014 Ex.Sess., and all propositions on the 6/3/2014 ballot) (stating “[n]o blind person shall be” denied (1) admission to a chiropractic school, (2) the right to take a chiropractic exam, (3) a chiropractic diploma, (4) admission into an examination for a state chiropractic license, or (5) a chiropractic license “on the ground that he is blind”). That California statute does not apply extraterritorially in Iowa. Unlike California, the Iowa legislature has not enacted a statute requiring Palmer to waive requirements for blind persons. Simply because another state imposes such accommodations on an institution does not mean that those accommodations are not fundamental alterations of Palmer’s Iowa academic program. Palmer has provided ample evidence supporting why Cannon’s proposed accommodation would fundamentally alter its program, and our inquiry should end there.
Nor am I convinced otherwise by the fact that blind individuals have previously graduated from Palmer. These individuals attended Palmer many years ago. See Case W. Reserve Univ., 666 N.E.2d at 1385 (discounting testimony of blind doctor who graduated from Case Western because the doctor “attended [the university] twenty years ago, under entirely different circumstances than proposed today”). The academic standards of the profession have changed since those individuals graduated, and uniform technical standards have been adopted. Under the majority’s analysis, a school could never strengthen its program requirements for legitimate reasons if the result excludes a disabled person.
The commission erred, as a matter of law, by failing to defer to Palmer’s decision that Cannon could not satisfy its academic standards. See Wynne I, 932 F.2d at 26 (explaining institution must seek means of reasonably accommodating *353 individual and “[i]f the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means ... the court could rule as a matter of law that the institution had met its duty”). Palmer fulfilled its obligation of inquiry before denying Cannon’s requested accommodation of a sighted assistant to read X-rays. Palmer has reasonably concluded that the ability to personally see and interpret X-rays is essential in order to successfully diagnose and treat patients, without relying on the observations of an untrained sighted assistant. Considering the safety of future patients, there is nothing unreasonable about this requirement. The majority has not “struck a balance” between the statutory rights ensuring those with disabilities “meaningful access” to the benefits offered by educational institutions and “the legitimate interests” of those institutions in preserving the integrity of their programs. See Alexander v. Choate, 469 U.S. 287, 300-01, 105 S.Ct. 712, 720, 88 L.Ed.2d 661, 671-72 (1985). Rather, the majority and the commission have run roughshod over Palmer’s legitimate interests and the integrity of Palmer’s chiropractic program. Accordingly, I respectfully dissent.
MANSFIELD, J., joins this dissent.